**UNITED STATES of America**

v.

**Laurence WATERS, Defendant.**

**No. 91–CR–325.**

United States District Court, N.D. New York.

March 17, 1992.

Gary Sharpe, Acting U.S. Atty. (John Brunetti, of counsel) Syracuse, N.Y., for U.S.

Marsha A. Hunt, Syracuse, N.Y., for defendant.

---

**1.** A portion of the factual background is taken from the government's affidavit in support of a search warrant of defendant's residence. The facts are set forth as if they are true because they are the only general statement of facts

## MEMORANDUM–DECISION AND ORDER

MUNSON, Senior District Judge.

Presently before the court are defendant's omnibus pre-trial motions. Oral argument was heard on February 14, 1992 in Syracuse, New York.

### I. BACKGROUND [1]

Defendant is charged with five counts of knowingly possessing firearms in or affecting interstate commerce, having previously been committed to a mental institution, in violation of the Gun Control Act of 1968, 18 U.S.C. § 922(g)(4), as amended by the Firearm Owner's Protection Act of 1986, Pub.L. No. 99–308, 100 Stat. 449, 452 (1986).

On or about November 8, 1979, defendant was involuntarily placed in the St. Lawrence Psychiatric Center pursuant to New York Mental Hygiene Law § 9.27. This placement was made at the request of defendant's parents. Under § 9.27, a person can be placed in a mental institution based upon certificates filed by two physicians finding the defendant to be subject to involuntary detention. After sixty days, defendant requested that his confinement be converted from involuntary to voluntary status pursuant to § 9.13 of the Mental Hygiene Law. Defendant was discharged from the St. Lawrence Psychiatric Center on August 27, 1980.

In late 1989, agents of the Bureau of Alcohol, Tobacco and Firearms ("ATF") received the first of two letters they believed to be written by defendant. The first letter states that "all kinds of weapons" could be found "off one of Watertown's city bridges ... (need scuba)," and is signed by X. No return address is listed. The second letter is dated May 1, 1991 and states in part, "gentlemen, something for the future," followed by a listing of explosives and explosive components. The letter is signed by Larry Waters and the return address is 541 Stone Street, Watertown.

provided to the court in this case. Defendant offers no general factual summary, although he does refer to some facts in the context of his omnibus motions.

ATF agents believed the handwriting in both letters to be the same.

In response to these letters, ATF Agent Harold Maxwell visited 541 Stone Street on May 8, 1991 to interview defendant. The house is apparently owned by defendant's parents, but defendant also resides there. Defendant was not at home when Agent Maxwell arrived, but his parents agreed to talk with the Agent. Defendants' parents told Agent Maxwell that in 1979 defendant had his pistol permit revoked and several handguns confiscated after he pointed a pistol at someone. When defendant arrived home approximately one hour later, defendant also agreed to talk to Agent Maxwell. He admitted to writing the two letters and to owning several guns and corresponding ammunition. Defendant then produced six rifles, three shotguns, one machine gun, and a large quantity of ammunition for Agent Maxwell's inspection. During the interview, defendant discussed subversive activities, espionage, the CIA, and his affiliation with "the company." Agent Maxwell later described defendant's speech as "rambling, disjointed, and difficult to follow." See Affidavit of Harold Maxwell, Document ("Doc.") 12, Exhibit ("Exh.") B, Attachment B, at 3. At the conclusion of the interview, defendant Waters told Agent Maxwell that he was employed by the CIA and wrote another letter stating that "ATF regulations concerning in the service of the gov. related to IRS registered AFFIL, and immigration computer code name concerning destructive devices that control law." *Id.*

After this interview on May 8, 1991, Agent Maxwell contacted several other law enforcement officials seeking information concerning defendant. Maxwell also received a written statement from Dr. Lee Hanes, Director of the St. Lawrence Psychiatric Center, setting forth the dates which defendant had been a patient at the institution.

With this information in hand, on May 16, 1991 Agent Maxwell applied for a search warrant of defendant's residence at 541 Stone Street. The application was supported by an affidavit reciting the afore-mentioned information. Based on Maxwell's affidavit, Magistrate–Judge Gustave J. DiBianco issued a search warrant authorizing the government to search all buildings and appurtenances at 541 Stone Street. The search apparently uncovered five weapons: three bolt action rifles (counts 1–3), a semi-automatic carbine (count 4), and a lever-action rifle (count 5).

Defendant now moves for an order: (1) dismissing the indictment on the ground that an essential element of the crimes charged is not pleaded, (2) suppressing any tangible evidence recovered from the search due to defects in the search warrant, (3) suppressing statements made by defendant to Agent Maxwell, (4) requiring the government to provide *Brady* material, and (5) permitting defendant to make further motions. Defendant had also moved for a bill of particulars, but withdrew that motion based on recent government disclosures.

## II. DISCUSSION

### A. *Motion to Dismiss*

 Defendant moves to dismiss the indictment on the ground that there is no evidence to establish that he was previously "committed" to a mental institution as required by 18 U.S.C. § 922(g)(4). Specifically, defendant contends that he was never detained in an institution by judicial order, something he contends is a prerequisite to establishing actual commitment.

Section 922(g)(4), under which defendant is charged in each count of the indictment, provides in pertinent part:

> It shall be unlawful for any person—
> (4) who has been adjudicated as a mental defective or who has been committed to a mental institution;
> to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

The statute does not define the term "committed," nor has any court in this circuit addressed the issue of whether placement

in a mental institution pursuant to § 9.27 of the New York Mental Hygiene Law is a "commitment" for purposes of 18 U.S.C. § 922(g)(4).

Defendant contends that the consistent use of the term "admission" and the conspicuous absence of the term "commitment" in § 9.27 clearly indicates that involuntary placement in a mental institution under a two-physician certificate is not a formal "commitment" under 18 U.S.C. § 922(g)(4). Defendant argues that the principles set forth in *United States v. Giardina*, 861 F.2d 1334 (5th Cir.1988) and *United States v. Hansel*, 474 F.2d 1120 (8th Cir.1973), cases which found that hospitalization under Louisiana's and Nebraska's mental health laws did not constitute commitments, are equally applicable under New York law.

The government counters that an involuntary admission by a two-physician certificate under New York Mental Hygiene Law § 9.27 is a formal "commitment" as defined by 18 U.S.C. § 922(g)(4). According to the government, it was the intent of the New York Legislature under Article 9 of the Mental Hygiene Law to provide for commitments of patients in civil proceedings without judicial involvement. The government further contends that facts involved in *Giardina* and *Hansel* are clearly distinguishable from the facts of the case at bar. Last, the government argues that, given New York's statutory scheme, it was Congress's intent to include a person such as defendant within the proscription of 18 U.S.C. § 922(g)(4).

Whether defendant was "committed" to a mental institution is a question of federal law, but in making that determination, the court must consider state law. *See Giardina*, 861 F.2d at 1335 (citing *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 111–12, 103 S.Ct. 986, 991, 74 L.Ed.2d 845 (1983)). Once a determination based on state law is made, the court must then consider whether that outcome is consistent with federal policy. *Id.*

Section 9.27 of the New York Mental Hygiene Law ("MHL") provides that a director of a mental health facility may re-

ceive and retain a person alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians, accompanied by an application for admission. Section 9.31 provides that a patient who has been involuntarily admitted on a two-physician certification, or a person acting on the patient's behalf, may request a hearing before a judge within sixty days of the date of admission. The purpose of the hearing is to "determine the need for involuntary care and treatment." Also, the director of the mental facility may convert the involuntary admission to a voluntary or informal admission at any time during the patient's stay, provided the director finds the patient suitable for the change in status and the patient is willing to apply for a voluntary stay. *See* MHL § 9.23(a).

Once a patient is involuntarily admitted as provided by § 9.27, the director of the facility may retain the patient, without any further action, for a period of sixty days from the date of admission or thirty days from the issuance of a court order denying an application for release. *See* MHL § 9.33. If the director determines that such patient requires retention beyond the sixty-day period and the patient does not agree to remain in the hospital as a voluntary patient, then the director must apply to the supreme court or the county court in the county where the hospital is located for an order authorizing continued retention. *See* MHL § 9.33(a).

In considering whether a two-physician admission is a "commitment" under the current version of § 9.27 of the MHL, the court will first analyze New York's original statutory scheme, which provided for "admission on court commitment." *See Giardina*, 861 F.2d at 1335 (court reviewed Louisiana's prior statutory scheme to understand present statute). Section 74 of the Mental Hygiene Law, originally enacted in 1927 and amended in 1933, read as follows:

A person alleged to be insane, and who is not in confinement on a criminal charge, may be committed to and confined in an institution for the custody and treatment

of the insane, upon an order made by a judge … adjudging such person to be insane, upon a certificate made by two qualified examiners, accompanied by a verified petition therefor, or upon such certificate and petition, and after a hearing, as provided in this section.

1933 N.Y.Laws 395, at 931. The term commitment is consistently used in the statute to refer to this "admission by court commitment." In 1964, the legislature radically overhauled the Mental Hygiene Law, abolishing judicial certification of involuntary patients, and "replacing that procedure with a system of admissions which are initially medically-determined, but which are followed by notice and the opportunity for court review to safeguard the constitutional rights of patients." Memorandum of Governor Nelson A. Rockefeller, 1964 N.Y.Laws 738, at 1968 (McKinney). "One of the most significant aspects of the revised procedure calls for a speedy *commitment* of the involuntary patient based solely on a medical determination of the individual's need for hospitalization." Recent Statutes, *INSANE PERSONS—New York Statute Replaces Judicial Certification of Involuntary Mental Patients with a System of Medically Determined Commitments. N.Y. Mental Hygiene Law §§ 72–74 (Supp.1964)*, 43 Tex.L.Rev. 599 (1965) (emphasis added). Thus, New York's prior statutory scheme strongly indicates that the current version of the Mental Hygiene Law, which was recodified in 1972 from Article 33 to Article 9, does not require court involvement to effectuate a formal commitment.

In addition to the prior statutory scheme, at least one New York court has indicated that Article 9 was intended to provide for commitments of patients in civil proceedings without judicial involvement. *See People ex rel. Powell v. Warden, Kings County Hosp.*, 73 A.D.2d 654, 422 N.Y.S.2d 726, 728 (2d Dep't 1979). In *Powell*, the Second Department described the role of the judiciary under Article 9 as "restricted, for the most part, to a review of the discretion exercised by the autonomous departmental office[ ] of mental health. . . ." *Id.* 422 N.Y.S.2d at 728. The court also stated

that § 9.27 "provide[s] for commitment without judicial involvement." *Id.* 422 N.Y.S.2d at 729.

Yet another indication that the legislature intended the two-physician certification procedure to be a formal commitment is the fact that in 1977 the New York Legislature added subsection (h) to § 9.27. The new subsection specifically referred to the two-physician procedure described in the body of § 9.27 as a "commitment." *See* 1977 N.Y.Laws 978, § 7.

Despite these facts, defendant maintains that the reasoning in both *Giardina* and *Hansel* is applicable to the case at bar. The court disagrees.

In *Hansel*, the Eighth Circuit held that defendant's hospitalization, pursuant to an order of the Board of Mental Health of Lancaster County, Nebraska, was not a commitment within the meaning of the Gun Control Act. *Hansel*, 474 F.2d at 1120. In that case, the defendant was hospitalized pursuant to 5 Neb.Rev.Stat. § 83–328 (1971). He was examined by one physician, found not to have a serious mental disorder and was subsequently released on "convalescent leave" after two weeks. *Id.* at 1122. Nebraska had a two-step procedure for admitting persons to a mental hospital. The first step provided for a temporary hospitalization of an individual for psychiatric observation if the County Mental Health Board ("Board") made a determination that such person was mentally ill and in need of hospitalization. Second, if during this period of observation, the superintendent of the hospital determined that the patient was mentally ill and should be committed, the patient could be committed to a hospital *only if* the superintendent certified his determination to the Board. *Id.* at 1123 (citing Neb.Rev.Stat. § 83–328) (emphasis added).

Since there was evidence that the superintendent of the hospital never filed certification with the Board as prescribed by 5 Neb.Rev.Stat. § 83–328, the court found that the commitment procedure was never completed. Therefore, the court held that the defendant's hospitalization pursuant to

the Nebraska statute was a "period of observation" and it was not a "commitment" within the meaning of the Gun Control Act. *Id.* at 1123.

Unlike the Nebraska procedure at issue in *Hansel,* neither § 9.27, nor any other provision of the New York Mental Hygiene Law, indicates that the § 9.27 commitment is not complete prior to a judicial order. In fact, a patient could be detained indefinitely under the Mental Hygiene Law, first under § 9.27 and then under § 9.23(a), without ever having to go before a judge. Therefore, the decision has no applicability to the case at bar.

In *Giardina,* the defendant was involuntarily admitted to a mental hospital pursuant to the emergency certificate procedures set forth in the Louisiana Mental Health Law. Defendant was detained at the hospital for a period of two weeks. Defendant was then released. Three years later the defendant purchased firearms and he was subsequently indicted for two counts of violating 18 U.S.C. § 922(g)(4). The trial court ruled that defendant had been "committed" as defined by § 922(g) by reason of his involuntary admission to a mental hospital. The Fifth Circuit reversed. In reviewing the Louisiana Mental Health Law, the court noted that it avoided the use of the terms "committed" or "commitment," except in a section which detailed procedures for obtaining a formal judicial commitment. *Giardina,* 861 F.2d at 1336. Under the facts in that case, the court determined that defendant could not be detained beyond the two-week period unless a judicial commitment order was obtained. No such order was obtained, leading the Fifth Circuit to its conclusion that defendant had not been "committed" for purposes of 18 U.S.C. § 922(g)(4).

The Louisiana statute at issue in *Giardina,* unlike § 9.27 of the New York Mental Hygiene Law, only authorizes detention of the patient for a short period of time (fifteen days).[2] More importantly, the Louisiana statute specifically requires a judicial

commitment to retain the patient for a longer period. No such requirement is found in the New York statute. This court therefore concludes that both *Hansel* and *Giardina* are distinguishable from the case at bar. Based on the discussion set forth *supra* at 1114–1115, the court holds that the procedure set forth in § 9.27 constitutes a "commitment" within the meaning of 18 U.S.C. § 922(g)(4).

The court must next consider whether such a conclusion comports with federal policy. Congress' intent in enacting the relevant portions of the Gun Control Act was "to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." *Dickerson,* 460 U.S. at 112, 103 S.Ct. at 991 (quoting *Lewis v. United States,* 445 U.S. 55, 63, 100 S.Ct. 915, 920, 63 L.Ed.2d 198 (1980)); *see also Huddleston v. United States,* 415 U.S. 814, 824–29, 94 S.Ct. 1262, 1268–71, 39 L.Ed.2d 782 (1974) (quoting the history of the legislation which became the Gun Control Act of 1968). When defendant was involuntarily confined to the mental institution under § 9.27, he was clearly considered dangerous to society. *See Project Release v. Prevost,* 722 F.2d 960, 973 (2d Cir.1983) (section 9.27 only permits the involuntary confinement of dangerous individuals who cannot "survive in the community"). When the involuntary admission was converted to a voluntary admission pursuant to § 9.23, defendant was still plagued by mental illness and therefore continued to be a threat to society. This person is precisely the type of individual whom Congress determined poses a potential threat to society by possessing firearms and whom Congress prohibited from possessing firearms under the Gun Control Act.

It is undisputed that 18 U.S.C. § 922(g)(4) does not require "judicial" commitment to come under the ambit of the statute. *See* Conf.Rep. No. 1956, 90th Cong., 2d Sess., *reprinted in* 1968

---

**2.** This is similar to MHL § 9.39, which provides that the director of a hospital may retain a person in a hospital for a period of 15 days, if

that person is alleged to have a mental illness likely to result in serious harm to himself or others.

U.S.Code Cong. & Admin.News 4426, 4429–30; *see also Giardina*, 861 F.2d at 1337 (citing *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983)). Rather, what is required is a "formal" commitment, which, in the instance of New York, can be accomplished through a two-physician certification.

Having concluded that a formal "commitment" of defendant under § 9.27 did occur in the case at bar, defendant's motion to dismiss the indictment on this basis is hereby denied.

### B. *Motion to Suppress Tangible Evidence*

Defendant's second motion seeks to suppress at trial tangible evidence found at defendant's residence when he was arrested by law enforcement officials. Defendant contends that the search warrant relied upon by the government to conduct the search was invalid. Specifically, defendant contends that (1) the search warrant was not issued by a neutral and detached magistrate, (2) probable cause did not exist to issue the warrant, and (3) the warrant was overbroad. These arguments will be discussed *seriatim.*

### 1. Neutral and Detached Magistrate

■ At the time defendant was arraigned, Magistrate–Judge DiBianco stated that he remembered receiving letters from defendant when he was formerly an Assistant United States Attorney. Magistrate–Judge DiBianco also stated that if the case were to reappear before him for further proceedings, he might be compelled to recuse himself. Defendant contends that the letters Magistrate–Judge DiBianco referred to may have been related, either directly or indirectly, to the subject matter of the present indictment. As such, defendant argues that the Magistrate–Judge was not neutral and detached when he issued the search warrant on May 16, 1991.

■ Every magistrate, judge, or justice must "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Dis-

qualification is appropriate only if the facts provide what an objective, knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality. *United States v. DeLuna*, 763 F.2d 897 (8th Cir.1985), *cert. denied*, 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985) (citations omitted). A magistrate must also disqualify himself if "he has served in governmental employment and in such capacity participated as counsel ... concerning the proceeding." 28 U.S.C. § 455(b)(3).

Defendant has not produced sufficient evidence to lead a reasonable person to believe that Magistrate–Judge DiBianco was in any way involved in an investigation or other preliminary matter involving the defendant prior to becoming a Magistrate–Judge. There is no evidence that any details set forth in the affidavit supporting the government's request for a search warrant were connected with any investigation conducted by then Assistant United States Attorney DiBianco. *See United States v. Outler*, 659 F.2d 1306, 1312 (5th Cir.1981). "Neither are there facts alleged which would cause a reasonable person, knowledgeable of all the facts, to believe that the magistrate was unable to impartially assess the existence of probable cause. Knowledge of and from a prior investigation does not necessarily require recusal." *DeLuna*, 763 F.2d at 908. Absent concrete evidence that Magistrate–Judge DiBianco was involved in his prior capacity as Assistant United States Attorney in an investigation of defendant as an open criminal file to which he was assigned, there is no basis upon which to invalidate the May 16, 1991 search warrant. *Id.* at 908.

### 2. Probable Cause

■ Defendant next contends that probable cause did not exist to issue the search warrant. Defendant argues that the letters relied on by Agent Maxwell in his affidavit have no relevance to the allegations in the indictment. Further, defendant contends that the statements allegedly made by his parents are purely hearsay, with no basis upon which to ascertain their

reliability. Moreover, defendant contends that the statements are highly irrelevant, and even prejudicial, in that they refer to prior acts of alleged misconduct by defendant. Finally, defendant argues that his own statements made to Agent Maxwell do not support a finding of probable cause because it is impossible to determine whether such alleged statements were voluntarily made, especially when Agent Maxwell conceded that defendant's speech during the interview was "rambling, disjointed, and difficult to follow."

Probable cause exists for issuance of a search warrant when there is a "fair probability" that the premises will yield the subject specified in the search warrant. *United States v. Travisano*, 724 F.2d 341, 346 (2d Cir.1983). Determinations by magistrates who issue warrants are "accorded great deference and 'any doubts should be resolved in favor of upholding the warrant[s].'" *United States v. Vasquez*, 634 F.2d 41, 45 (2d Cir.1980).

■ In the case of hearsay information contained in an affidavit in support of a search warrant, the hearsay can suffice to establish probable cause provided there is a substantial basis for crediting the hearsay. *United States v. Zucco*, 694 F.2d 44, 46–48 (2d Cir.1982). In this case, defendant's parents could have had reason to falsify their statements. Unlike the case in *United States v. Rollins*, 522 F.2d 160, 164 (2d Cir.1975), where the Second Circuit held that an unrelated bystander had no apparent motive to falsify, here defendant's parents were living with their son in the same house. Based on this fact alone, the court finds that there is an insubstantial basis for crediting the hearsay.

Conversely, the court does not believe that the voluntariness of defendant's statements was sufficiently questionable to prevent their use in the probable cause determination. But even if the mental condition of defendant was sufficiently suspect, and the testimony of defendant's parents should not have been credited, including such evidence in the warrant application would not necessarily undermine a finding of probable cause where other evidence is

sufficient to establish probable cause. *See Vasquez*, 634 F.2d at 45. Here, there was an overwhelming amount of detailed information set forth in agent Maxwell's affidavit for Magistrate–Judge DiBianco to conclude that there was a "fair probability" that the premises would yield guns and ammunition. Of great significance is the fact that defendant voluntarily showed Agent Maxwell several guns and ammunition during the May 8, 1991 interview. Since there is no question of fact created by defendant's motion to suppress on the probable cause argument, a pretrial suppression hearing is unnecessary.

### 3. Overbreadth

■ Defendant lastly contends that the search warrant was overbroad in that it permitted law enforcement officials to search the entire subject premises, with no limitations, including all outbuildings and appurtenances. Defendant argues taht the warrant should have been limited to areas within the control of defendant.

The warrant clause of the Fourth Amendment prohibits the issuance of any warrant except "upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." The Supreme Court reviewed the basis for the particularity requirement in *Maryland v. Garrison* as follows:

> By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prevent.

480 U.S. 79, 84, 107 S.Ct. 1013, 1016, 94 L.Ed.2d 72 (1987).

■ Generally, where a structure is divided into more than one unit, probable cause must exist for each unit to be searched. However, where the premises are occupied in common, or defendant is in control of the entire premises, probable cause need not be set forth in order to search each unit. *United States v. Gonza-*

*lez,* 697 F.2d 155, 156 (6th Cir.1983); *United States v. Whitney,* 633 F.2d 902, 907 (9th Cir.1980), *cert. denied,* 450 U.S. 1004, 101 S.Ct. 1717, 68 L.Ed.2d 208 (1981). Further, the Supreme Court has stated that "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Ross,* 456 U.S. 798, 821, 102 S.Ct. 2157, 2171, 72 L.Ed.2d 572 (1980).

In this case, Agent Maxwell was justified in believing that defendant had control of the entire premises such that the subject of the search warrant could be located anywhere in the residence, outbuildings, or appurtenances thereto, and agent Maxwell had probable cause to search the entire premises. Therefore, defendant's motion to suppress tangible evidence is denied.

## C. *Suppression of statements made by defendant*

■ Defendant seeks to suppress statements he made to agent Maxwell at his parent's house on May 8, 1991 on the ground that they were not made voluntarily. Defendant contends that his mental state during the interview is clearly at issue based on the fact that agent Maxwell described his speech as rambling, disjointed and difficult to follow, all factors which defendant argues point to involuntariness. The involuntary nature of the statements is allegedly further illustrated by defendant's belief that he was not free to leave or to terminate the interview. As such, defendant contends that he should have been Mirandized before being questioned. Defendant also contends that Agent Maxwell improperly failed to inform him that he did not have to consent to the interview. If the court is not inclined to suppress the statements based on these facts alone, defendant seeks a suppression hearing regarding this issue.

The court believes that it was unnecessary for agent Maxwell to read defendant his *Miranda* warnings, for the reason that the defendant was not in custody at the time he was questioned. Defendant's professed belief that he was not free to leave his house or to refuse to answer questions was not justified under the circumstances. *Cf. Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ("the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation"); *United States v. Hall,* 421 F.2d 540, 544–45 (2d Cir.1969), *cert. denied,* 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970). There is no evidence that defendant was ever told by agent Maxwell that he could not leave, nor is there evidence that defendant was treated uncourteously at his home by agent Maxwell. Further, defendant was never threatened with arrest if he refused to cooperate. *See United States v. Guarno,* 819 F.2d 28, 32 (2d Cir.1987) (failure of federal agents to threaten defendant with arrest if he refused to cooperate indicates defendant was not in custody). The failure of Agent Maxwell to tell defendant that he could refuse to answer questions also is not determinative. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Therefore, Agent Maxwell's failure to advise defendant of his rights does not require suppression of defendant's statement.

■ The court finds nothing in the submissions of the parties to demonstrate factual issues necessitating a suppression hearing on this issue at this time. The Second Circuit recently set forth the principles guiding a determination of whether a defendant is entitled, as a matter of law, to an evidentiary hearing to resolve questions of admissibility. *Gentile v. County of Suffolk,* 926 F.2d 142, 148 (2d Cir.1991). In holding that the trial judge acted within his authority in first admitting selected portions of a government investigation without an evidentiary hearing and in later allowing defendants to contest the trustworthiness of the report in a post-trial hearing, the Second Circuit held:

> In general, an evidentiary hearing need not be granted as a matter of course and must be held "only if the moving papers allege facts with sufficient definiteness,

clarity and specificity to enable the trial court to conclude that relief must be granted if the facts alleged are proved." *United States v. Carrion*, 463 F.2d 704, 706 (9th Cir.1972). General and conclusory factual allegations which are based upon mere suspicion or conjecture, however, will not suffice to necessitate a hearing. *Cohen v. United States*, 378 F.2d 751, 760 (9th Cir.), *cert. denied*, 389 U.S. 897 [88 S.Ct. 217, 19 L.Ed.2d 215] (1967). Moreover, if facts urged in support of a hearing would not entitle the moving party to relief as a matter of law, no evidentiary hearing is required. *See United States v. Irwin*, 612 F.2d 1182 (9th Cir.1980).

*Gentile*, 926 F.2d at 148 (quoting *United States v. Boffa*, 89 F.R.D. 523, 528 (D.Del. 1981)).

The court finds that defendant's affidavit fails to set forth facts which, if proven, would support suppression of his statement. There is no evidence of coercion on the part of agent Maxwell. Further, no reason is given for why defendant felt he was not free to refuse to answer questions. The court therefore concludes that defendant's "moving papers [do not] allege facts with sufficient definiteness, clarity and specificity to enable the court to conclude that relief must be granted if the facts alleged are proved." *United States v. Carrion*, 463 F.2d 704, 706 (9th Cir.1972). Defendant's request for a suppression hearing is therefore denied.

Defendant also moves to preclude from use at trial any and all other statements he may have made to government agents. Defendant offers no basis for the court to grant such a request, and it is therefore denied. In the alternative, defendant requests that he be provided with any such additional statements, and be granted leave to file any necessary motions regarding such statements. As will be discussed below, the government has acknowledged its continuing duty to provide *Brady* material, and the court therefore confines its ruling on the instant request to a direction that the government comply with this duty.

### D. *Brady material*

Defendant seeks disclosure, under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1983), of any and all evidence in the possession of the government which may be favorable to the defendant or aid defendant in the preparation of an adequate and proper defense.

The government recognizes its obligation to turn over all manner of *Brady* material at the appropriate times. Accordingly, the court need not make a substantive ruling and merely directs the government again to comply with this duty.

### E. *Right to make further motions*

Defendant requests that he be allowed to make additional pre-trial motions as the need arises. The government does not object to this request, so long as said motions could not have been made with due diligence as part of defendant's first set of omnibus motions. The court grants defendant's motion with the aforementioned limitation.

### III. CONCLUSION

Based on the foregoing reasons, defendant's motions to dismiss, to suppress tangible evidence, and to suppress statements are denied.

It Is So Ordered.