UNITED STATES of America, Appellee,

v.

Laurence G. WATERS, Defendant–
Appellant.

No. 325, Docket 93–1039.

United States Court of Appeals,
Second Circuit.

Argued Oct. 7, 1993.

Decided April 7, 1994.

Andrew Baxter, Asst. U.S. Atty., Syracuse, N.Y. (Gary L. Sharpe, U.S. Atty. for the N.D. of N.Y., Michael C. Olmsted, Asst. U.S. Atty., Syracuse, N.Y., of counsel), for appellee.

John A. Cirando, Syracuse, N.Y. (D.J. & J.A. Cirando, Patrick J. Haber, Ivette Iza Zenner, Syracuse, N.Y., of counsel), for defendant-appellant.

Before: PIERCE, MINER and ALTIMARI, Circuit Judges.

PIERCE, Circuit Judge:

Laurence G. Waters appeals from a January 8, 1993 judgment of conviction and sentence of the United States District Court for the Northern District of New York (Howard G. Munson, *Judge*). On November 13, 1991, Waters, having once been committed to a mental institution, was charged with several counts of possession of a firearm in violation of 18 U.S.C. § 922(g)(4) (1988). On September 25, 1992, Waters pleaded guilty to Count One of the indictment. On January 8, 1993, he was sentenced to serve a two-year term of probation, fined $2,500 and a special assessment of $50, and ordered to participate in a mental health treatment program. Waters appeals from the conviction and sentence.

## BACKGROUND [1]

On November 13, 1991, Waters was indicted by a federal grand jury in the Northern

1. The statutory language from the New York Mental Hygiene Law cited herein, located in the 1988 edition of McKinney's, published by West Publishing Company, is identical to the statutory

District of New York on five counts of violating the federal gun control statute. The indictment charged that on or about May 17, 1991, Waters "knowingly possessed a firearm in or affecting interstate commerce ... having then previously been committed to a mental institution." The sequence of events leading to the indictment began when Waters sent two letters to the United States Bureau of Alcohol, Tobacco and Firearms ("ATF") between 1989 and 1991 which claimed knowledge of the location of weapons and firearms.[2] Upon receipt of the letters, the ATF commenced an investigation. On May 8, 1991, an ATF special agent interviewed Waters at his residence. During the interview, Waters displayed a cache of weapons to the agent: six rifles, three shotguns, one machine gun, and a large quantity of ammunition. Waters also discussed subversive activities, espionage, the Central Intelligence Agency, and "the company." After the interview, Waters sent a letter to the ATF in which he stated: "ATF regulations concerning in the service of the gov. related to IRS registered AFFIL, and immagration [sic] computer code name concerning destructive devices that control law."

Following the interview with Waters, the ATF discovered that he had been involuntarily hospitalized at St. Lawrence Psychiatric Center on November 8, 1979, on a Two–Physicians Certificate, in accordance with New York Mental Hygiene Law § 9.27(a), which states:

> The director of a hospital may receive and retain therein as a patient any person alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians, accompanied by an application for the admission of such person. The examination may be conducted jointly but each examining physician shall execute a separate certificate.

There is no indication that Waters, at that time, challenged his involuntary hospitalization, although § 9.31(a) of the Mental Hygiene Law provides that anyone involuntarily admitted pursuant to medical certification may request a hearing on the question of the need for involuntary care and treatment "at any time prior to the expiration of sixty days from the date of involuntary admission of [the] patient." He was placed on "Convalescent Care" status on December 5, 1979. On January 7, 1980, sixty days after he had been admitted to the facility, Waters requested that his status be converted to voluntary status, pursuant to § 9.23(a), which provides that the director of a mental facility shall convert a patient from involuntary status to voluntary status as long as she is "suitable and willing to apply therefor." He was released seven months later, on August 27, 1980. Following the ATF investigation, a federal grand jury indicted Waters on November 13, 1991, for violation of the federal Gun Control Act in that he possessed firearms after having been committed to a mental institution, in violation of 18 U.S.C. § 922(g)(4), which states that it shall be unlawful for anyone

> (4) who has been adjudicated as a mental defective or who has been committed to a mental institution;
>
> . . . .
>
> to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

On January 15, 1992, Waters moved to dismiss his indictment, claiming, *inter alia*, that his admission to the psychiatric hospital in 1979 did not constitute a "commitment" to a mental institution within the meaning of 18 U.S.C. § 922(g)(4) because there was no judicial order of commitment. The district court denied the motion on March 17, 1992, finding, *inter alia*, that although § 922(g)(4) does not define the term "committed," Waters' commitment pursuant to New York State law was sufficient under federal policy. *United*

---

language in the previous 1978 edition of the law that was in effect when Waters was admitted to a mental health facility in 1979.

2. In 1977, Waters received a federal license to deal in firearms. In 1981, however, the Government discontinued renewing his license.

*States v. Waters,* 786 F.Supp. 1111, 1113, 1116–17 (N.D.N.Y.1992).

Waters next ·moved, on June 4, 1992, to dismiss his indictment on the ground that the current version of 18 U.S.C. § 922(g)(4) was enacted in 1986, seven years after his. "alleged" commitment, and thus the indictment violated the *Ex Post Facto* clause of the United States Constitution. On July 10, 1992, this argument was rejected by the district court, which stated that the *Ex Post Facto* clause did not apply because the act for which Waters was indicted—i.e., the possession of the firearms—occurred after § 922(g)(4) became law.

Thereafter, on September 25, 1992, Waters signed a conditional plea agreement with the Government, agreeing to plead guilty to the first count of the five-count indictment, which charged as follows:

> On or about May 17, 1991, in the Northern District of New York, the defendant, LAURENCE WATERS, knowingly possessed a firearm in or affecting interstate commerce ... having then previously been committed to a mental institution.

As part of the plea agreement, Waters preserved the right to appeal one issue, namely, "whether [his] involuntary hospitalization at the St. Lawrence Psychiatric Center from on or about November 7, 1979 constituted a 'commitment' as that term is used in [18 U.S.C. § 922(g)(4) ]." The district court accepted his guilty plea to Count One of the indictment, following a plea colloquy, on September 25, 1992. On January 8, 1993, Waters was sentenced to serve a two-year term of probation, to pay a fine of $2,500 and a special assessment of $50, and to participate in a mental health treatment program as directed by the Probation Office. Waters filed a timely notice of appeal.

## DISCUSSION

Waters' first argument upon appeal presents a novel issue for the Court: ,whether an involuntary hospitalization pursuant to New York Mental Hygiene Law constitutes a commitment to a mental institution within the

meaning of 18 U.S.C. § 922(g)(4). Waters argues that his hospitalization pursuant to N.Y.Mental Hyg.Law § 9.27(a) (McKinney 1988) did not constitute a "commitment" within the meaning of 18 U.S.C. § 922(g)(4) because there was no formal commitment process or judicial order. The Government counters that New York's certification procedure for admission adequately constitutes a "commitment" to a mental institution for the purposes of 18 U.S.C. § 922(g)(4).

The district court's interpretation of the term "commitment" to a mental institution under 18 U.S.C. § 922(g)(4) is reviewed *de novo* by this Court. *See United States v. Liranzo,* 944 F.2d 73, 79 (2d Cir.1991). The Gun Control Act does not define the term "commitment." *See* 18 U.S.C. § 922; *see also United States v. Giardina,* 861 F.2d 1334, 1335 (5th Cir.1988). While determination of the issue of whether the appellant "was committed to a mental institution is. a question of federal law," a reviewing court may "seek guidance from state law." *Giardina,* 861 F.2d at 1335; *see also United States v. Hansel,* 474 F.2d 1120, 1122–23 (8th Cir.1973) (the court considered the mental health law of Nebraska in determining "commitment");[3] *cf. Dickerson v. New Banner Inst., Inc.,* 460 U.S. 103, 111–12, 103 S.Ct. 986, 991, 74 L.Ed.2d 845 (1983) ("Whether one has been 'convicted' within the language of the gun control statutes is ... a question of federal ... law, despite the fact that the predicate offense and its punishment are defined by the law of the State.") (citation omitted). Once state law has addressed the general question, the federal court must then consider if the outcome is consistent with federal policy. *See Giardina,* 861 F.2d at 1335.

The New York Mental Hygiene statute was enacted in 1927, *see* 1927 N.Y.Laws 981, and amended in 1933 to allow commitment upon the certification of two physicians and a hearing before a judge. 1933 N.Y.Laws 926, 931. The hearing requirement was abolished in 1964 and replaced

---

**3.** The defendant in *Hansel* was charged with violating 18 U.S.C. § 922(h) of the 1968 Gun Control Act, which was incorporated into

§ 922(g) of the 1986 Gun Control Act. H.R.Rep. No. 99–495, 99th Cong., 2d Sess. (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1349.

with a system of admissions procedures into hospitals or mental health facilities "which are initially medically-determined, but which are followed by notice and the opportunity for court review." Memorandum of Gov. Nelson A. Rockefeller, 1964 N.Y.Laws 1211, 1968. Section 9.27(h) of the statute states that "[i]f a person is examined and determined to be mentally ill, the fact that such person suffers from alcohol or substance abuse shall not preclude *commitment* under this section." (emphasis added). The change in the procedures instituted by the state legislature, and the retention of the term "commitment" in at least one section of the Mental Hygiene Law, suggests that the admission and retention procedures used by New York are meant to constitute a "commitment" into a mental health facility or hospital.

The New York State Mental Hygiene Law was amended in 1964 in order to recognize "the medical necessity of prompt treatment of psychiatric ills [while preserving] due process safeguards of every person who is admitted to a psychiatric facility for care and treatment." 1964 N.Y.Laws at 1968. Thus, the law was fashioned to allow the speedy and efficient care of mentally ill persons, upon the recommendations of both physicians and psychiatrists. In order to be involuntarily admitted to a mental health facility, one must be "mentally ill and in need of involuntary care and treatment." N.Y.Mental Hyg.Law § 9.27(a). A person is " 'in need of involuntary care and treatment' [if that] person has a mental illness for which care and treatment as a patient in a hospital is essential to such person's welfare and whose judgment is so impaired that he [or she] is unable to understand the need for such care and treatment." *Id.* § 9.01 (McKinney 1988 & Supp.1994). In addition, the person must "pose[ ] a substantial threat

of physical harm to herself or to others." *In re Jeannette S.*, 157 A.D.2d 783, 550 N.Y.S.2d 383, 384 (2d Dep't 1990) (mem.) (citations omitted). Section 9.27 allows for the involuntary admission of an individual based upon an application of a relative or other qualified person, and a two-physician certificate.[4] A psychiatrist must examine the person upon arrival at the hospital or mental health facility, and if it is found that involuntary treatment is appropriate, the person may be admitted. N.Y.Mental Hyg.Law § 9.27(e). Section 9.31(a) provides for a hearing for an involuntarily admitted patient upon request "at any time prior to the expiration of sixty days from the date of involuntary admission." Such hearing would occur in the "supreme court or the county court in the county designated by the applicant, ... or if no designation be made ... where [the hospital or mental health facility] is located." *Id.* § 9.31(b). Finally, § 9.33(a) requires that the director of a mental health facility obtain a court order authorizing the continued detainment of a patient within sixty days of the date of retention "if such patient does not agree to remain in such hospital as a voluntary patient." Thus, New York State provides an involuntarily admitted patient with "a rather elaborate procedural scheme for notice, hearing, review, and judicial approval of continued retention in a mental health facility."[5] *Goetz v. Crosson*, 967 F.2d 29, 32 (2d Cir.1992). This scheme has withstood challenges that it was facially unconstitutional. *See Project Release v. Prevost*, 722 F.2d 960, 971–81 (2d Cir.1983). Section 9.23(a) provides for the conversion to voluntary status. There are also provisions and procedures for emergency admission. N.Y.Mental Hyg.Law § 9.39.

New York State caselaw, which refers to § 9.27 of the Mental Hygiene Law, supports

---

4. A certificate signed by a physician or psychiatrist must

 show that the person [whose admission is sought] is mentally ill[,] and shall be based on an examination of the person alleged to be mentally ill made within ten days prior to the date of admission.... All certificates shall contain the facts and circumstances upon which the judgment of the physicians is based
 . . . .

N.Y.Mental Hyg.Law § 9.05(b).

5. In fact, § 9.07(a) requires that a patient be given notice of her rights immediately upon admission. In addition, "upon the request of the patient or of anyone on the patient's behalf, the patient shall be permitted to communicate with the mental hygiene legal service and avail himself [or herself] of the facilities thereof." N.Y.Mental Hyg.Law § 9.07(a).

the proposition that an "admission" under this section is, in fact, a "commitment." *See People ex rel. Powell v. Warden, Kings County Hosp.*, 73 A.D.2d 654, 422 N.Y.S.2d 726, 729 (2d Dep't 1979) ("Other statutory provisions [in Article 9 in addition to § 9.27] similarly provide for commitment without judicial involvement."); *Boggs v. NYC Health and Hosps. Corp.*, 70 N.Y.2d 972, 520 N.E.2d 515, 516, 525 N.Y.S.2d 796, 797 (1988) (New York Court of Appeals uses the term "commitment" when referring to § 9.27); *Fhagen v. Miller*, 29 N.Y.2d 348, 278 N.E.2d 615, 615, 328 N.Y.S.2d 393, 394 (Changes to the Mental Hygiene Law were made "upon the recommendation of a special committee to study procedures for the commitment of the mentally ill."), *cert. denied*, 409 U.S. 845, 93 S.Ct. 47, 34 L.Ed.2d 85 (1972). In addition, our Court has used the term "commitment" when referring to § 9.27 of the New York Mental Hygiene Law. *See Goetz*, 967 F.2d at 31–32 ("A subject of a commitment proceeding may be committed ... upon the application of a relative ... and the certification of two examining physicians."); *Project Release*, 722 F.2d at 972 ("[s]ection[ ] 9.27 ... permit[s] involuntary civil commitment").

Waters argues that because he was not " 'committed' by a mental health board, a commission, or by court order, but rather was 'admitted' by the medical decision of two physicians," he was not "committed" to a mental health facility within the meaning of the gun control statute. Thus, he argues, given the requirement that criminal statutes must be "strictly construed" and that statutory terms be given their narrow meanings, *see Yates v. United States*, 354 U.S. 298, 310, 77 S.Ct. 1064, 1072, 1 L.Ed.2d 1356 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978), he was not committed to a mental health facility. Waters relies primarily upon *Giardina* and *Hansel* to support his conclusion. In *Giardina*, the issue was "whether [the appellant's] involuntary hospitalization constituted a commitment to a mental institution under 18 U.S.C. § 922(g)(4)." 861 F.2d at 1335. The appellant in that case was hospitalized in 1984 under a Louisiana statute which allowed for detainment upon the certificates of two physicians. *Id.* at 1334. The appellant was held for treatment for two weeks, and then released. Under the provisions of the Louisiana statute, "involuntary detention beyond 15 days ... must be [by] a judicial commitment." *Id.* at 1336. No judicial commitment ever occurred. The appellant pleaded guilty to violating § 922(g)(4) of the gun control statute. *Id.* at 1335. The Fifth Circuit vacated the conviction and sentence, holding that the appellant's involuntary hospitalization did not constitute a "commitment" under § 922(g)(4) because there was no formal commitment proceeding under Louisiana law. *Id.* at 1336–37.

The Eighth Circuit, in *Hansel*, addressed the same issue as the *Giardina* court: "whether the defendant's hospitalization ... was a 'commitment' " under the federal gun control statute. 474 F.2d at 1122. In *Hansel*, a Nebraska mental health board "found the defendant to be mentally ill and in need of hospitalization and ordered him hospitalized." *Id.* Thereafter, he "was released from the hospital on 'convalescent leave' after two weeks, and was shortly thereafter formally discharged." *Id.* The Nebraska statute under which the defendant had been hospitalized specified that "an individual may be *committed* to a hospital if ... the superintendent of the state mental hospital determines that the individual is mentally ill and then certifies this determination to the County Board of Mental Health." *Id.* at 1123. This did not occur. The defendant was convicted of violating the gun control statute by purchasing a firearm after having been adjudicated a mental defective. *Id.* On appeal, the Government conceded that "the defendant was not committed because there was no compliance with [Nebraska law]." *Id.* at 1122. The Eighth Circuit reversed the conviction, finding that the defendant had not been "committed" under Nebraska law, and that the finding of mental defectiveness did not comport with the gun control statute. *Id.* at 1123, 1125. In so finding, the court stated that "[w]e can speculate that Congress desired to keep guns from all who had a history of mental illness and we might agree that such a policy would be desirable; but we

can find no support for such a holding on our part." *Id.* at 1125 (footnote omitted).

Waters claims that his case is similar to both *Giardina* and *Hansel* because there was never any formal judicial "commitment" or adjudication of mental illness. He concludes that "there is no indication in the [federal gun control] statute ... of an intent to prohibit the possession of firearms by a person who had been hospitalized under an *allegation* of mental illness ... where no determination of mental illness requiring 'commitment' had been found."

We find Waters' arguments unpersuasive. If, in this case, the appellant's detention had required, under state law, a judicial proceeding in order to determine whether he was to be retained, and this had not occurred, then, as in *Giardina* and *Hansel,* his hospitalization would not have constituted a "commitment." In *Giardina,* the law of Louisiana required that where the director of the mental institution wished to detain a patient for longer than the specified period, a judicial hearing was required. 861 F.2d at 1336. The hearing never occurred. *Id.* at 1334. Similarly, in *Hansel,* the defendant was released from a mental institution without a certification having been filed with the Mental Health Board, as was required by the Nebraska statute, and thus formal commitment was never completed. 474 F.2d at 1123. Here, under the applicable state statute, an involuntary admission can lead to an indefinite hospitalization if the patient chooses to convert her status to voluntary after sixty days. *See* N.Y.Mental Hyg.Law §§ 9.23(a) and 9.33(a). A formal judicial proceeding is required: (i) if a hospital or mental health facility wishes to continue an involuntary hospitalization and the patient fails to request conversion to voluntary status; (ii) when the patient requests a judicial proceeding prior to the expiration of sixty days from the date of involuntary admission; or (iii) when a relative, friend, or the mental hygiene legal service, on behalf of the patient, requests a judicial proceeding prior to the expiration of sixty days from the date of the patient's involuntary admission. *See id.* §§ 9.31(a) and 9.33(a). Here, Waters requested that his status be converted to voluntary status, and thus no formal judicial proceeding was required under New York State law. We conclude that, whether termed an "admission" or a "commitment," § 9.27 established "commitment" procedures under New York State law, and Waters was "committed" pursuant to those procedures.

Next, it must be determined whether this outcome is consistent with federal policy. Waters argues that the legislative history of the gun control statute demonstrates that Waters was not "committed" within the meaning of the federal statute. The legislative history of the gun control statute states that it would be unlawful to possess a firearm under the statute if one has been formally committed pursuant to court order, H.R.Rep. No. 1577, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.C.C.A.N. 4410, 4421, or committed by a mental health board or commission in jurisdictions where these bodies "constitute the adjudicating or committing authority." H.R.Rep. No. 1956, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.C.C.A.N. 4426, 4429–4430. The legislative history cited by Waters does not address admissions procedures into mental health facilities which, in New York State, are based on a medical determination of an individual's need for hospitalization.

In *Huddleston v. United States,* 415 U.S. 814, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974), the Supreme Court stated that:

> The principal purpose of the federal gun control legislation ... was to curb crime by keeping "firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency."

415 U.S. at 824, 94 S.Ct. at 1268 (citation omitted). The federal gun control statute is designed to prohibit the ownership of firearms not only by individuals who have already committed dangerous acts, but also by those with a potential for violence as well. *See, e.g.,* 18 U.S.C. § 922(n) (prohibiting the possession of firearms by individuals under indictment, even though they are presumed innocent under the law); 18 U.S.C. §§ 922(g)(3), (g)(5), and (g)(7) (prohibits, respectively, the possession of firearms by unlawful users of controlled substances, illegal

aliens, and citizens who have renounced their citizenship). A perusal of the legislative history of the statute indicates that Congress would broadly apply the prohibition against the ownership of firearms by "mentally unstable" or "irresponsible" persons. *See* H.R. 17735, 90th Cong., 2d Sess. (1968), 114 Cong. Rec. 21780, 21791, 21832, and 22270 (1968).

We believe that the New York State system of involuntary admission under § 9.27, with its attendant requirements of notice and judicial proceedings, comports with federal policy. Under § 9.27(a), a person must be "in need of involuntary care and treatment" in order to be admitted. Such treatment is necessary when it is "essential to such person's welfare and whose judgment is so impaired that he [or she] is unable to understand the need for such care and treatment." N.Y.Mental Hyg.Law § 9.01. Thus, as we found in *Project Release*, § 9.27 permits only the involuntary confinement of dangerous individuals who cannot survive in the community. 722 F.2d at 973–74. The federal gun control statute was designed to prevent ownership of firearms by just such persons. *See Huddleston*, 415 U.S. at 824, 94 S.Ct. at 1268; *Dickerson*, 460 U.S. at 112, 103 S.Ct. at 991. Here, Waters possessed a cache of firearms and a large quantity of ammunition and reported unsubstantiated strange "plots" to the ATF agents. Based upon the preceding analysis, we believe that it is wholly reasonable to conclude that, given the history of appellant and the fact that he gave evidence of having delusions, such a person, in possession of firearms, poses a grave and serious risk to the public at large. We believe this risk places appellant within the embrace of the prohibition Congress intended. The fact that he is no longer committed does not change this conclusion. "Congress made no exception for subsequent curative events. The past adjudication or commitment disqualifies ... [because] such a person ... [is] too much of a risk to be allowed firearms privileges." *Dickerson*, 460 U.S. at 116, 103 S.Ct. at 993 (citation omitted). Several federal courts have held that the statutory restrictions of the federal Gun Control Act regarding possession of firearms apply to persons who have been committed to mental health facilities and are later released or found to be competent. *See, e.g., Redford v. United States Dep't of Treasury, Bureau of Alcohol, Tobacco and Firearms*, 691 F.2d 471, 473 (10th Cir.1982) (the prohibition of the federal gun control statute against those adjudicated mentally incompetent "provides no exceptions for people who have regained their competency or sanity or who have been released from confinement"); *United States v. Buffaloe*, 449 F.2d 779, 780 (4th Cir.1971) (per curiam) ("We also conclude that the [federal gun control] statute is not unconstitutional as to [appellant] because 16 months later he was discharged from the hospital."); *United States v. Jones*, 569 F.Supp. 395, 398–99 (D.S.C.1983) (finding that the statute did not unjustly punish persons who had been, at one point, adjudicated mentally ill).

In addition, the federal Gun Control Act provides "an administrative remedy to former mental patients." *Department of Treasury v. Galioto*, 477 U.S. 556, 559, 106 S.Ct. 2683, 2685, 91 L.Ed.2d 459 (1986). Specifically, § 925(c) provides:

A person who is prohibited from possessing, shipping, transporting, or receiving firearms or ammunition may make application to the Secretary [of the United States Department of Treasury] for relief from the disabilities imposed by Federal laws.... [T]he Secretary may grant such relief if it is established to his satisfaction that the circumstances regarding the disability ... are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest. Any person whose application for relief from disabilities is denied by the Secretary may file a petition with the United States district court ... for a judicial review of such denial.

18 U.S.C. § 925(c) (1988 & Supp. IV 1992). Section 178.144, in Title 27 of the Code of Federal Regulations, describes the procedures by which one could petition for relief from the disabilities of 18 U.S.C. § 922(g). Thus, Waters could have petitioned, after this remedy was enacted in 1986, to be relieved from any disability under the federal Gun Control Act. *See Galioto*, 477 U.S. at 559, 106 S.Ct. at 2685. He did not do so.

In sum, then, Waters (i) was "committed" to a mental health facility under New York State law; (ii) his commitment comported with the policy of the federal Gun Control Act, which seeks to keep firearms out of the hands of potentially dangerous and irresponsible persons; and (iii) he had the opportunity, under the federal gun control statute, to avail himself of an administrative remedy to remove the disability of having once been committed to a mental health facility. Accordingly, we hold that the involuntary admission procedures of the New York Mental Hygiene Law constitute a "commitment" within the meaning of 18 U.S.C. § 922(g)(4), and Waters' conviction on this issue is affirmed.

The second issue raised by Waters on appeal is whether 18 U.S.C. § 922(g)(4), passed in 1986, can constitutionally be applied to his involuntary hospitalization in 1979, where he possessed firearms after 1986. We hold that the statute can be so applied. In the first place, the federal gun control statute punishes the *possession* and not merely the *acquisition* of a firearm. Thus, the fact that Waters was, at one time, a licensed dealer in firearms does not avail him here, because possession is a continuing offense. *See Cody v. United States*, 460 F.2d 34, 35, 37 (8th Cir.) (court upheld application of a section of the federal Gun Control Act where the disqualifying status occurred before passage of the statute, but the prohibited *possession* occurred after the statute was enacted), *cert. denied*, 409 U.S. 1010, 93 S.Ct. 454, 34 L.Ed.2d 303 (1972); *von Eichelberger v. United States*, 252 F.2d 184, 185 (9th Cir.1958) (the court, in discussing a violation of firearms regulations in the Internal Revenue Code, stated that possession is a continuing offense). In any event, Waters' *Ex Post Facto* claim was not properly preserved for appeal. Waters' plea agreement specifically reserved only the issue of whether or not he was "committed" within the meaning of 18 U.S.C. § 922(g)(4). It is well-established law in this Circuit that "in the absence of a court-approved reservation of issues for appeal, [a defendant pleading guilty] waives all challenges to the prosecution except those going to the court's jurisdiction." *Hayle v. United*

*States*, 815 F.2d 879, 881 (2d Cir.1987) (citing cases).

## CONCLUSION

We have considered all of the issues raised by Waters on appeal and find them to be without merit. The judgment of the district court is affirmed.