UNITED STATES of America,
Plaintiff–Appellee,

v.

David Michael VERTZ, Jr.,
Defendant–Appellant.

No. 00–2237.

United States Court of Appeals,
Sixth Circuit.

June 20, 2002.

Before GUY and CLAY, Circuit Judges; and NUGENT, District Judge.*

## OPINION

NUGENT, District Judge.

Appellant, David Michael Vertz, Jr., appeals from the district court's denial of his Motion in Limine to Dismiss and from the sentencing order. Vertz claims that (1) the district court erred in denying his Motion in Limine to Dismiss the Indictment because as a matter of law he has never been committed to a mental health institution and, in the alternative (2) the district court erred by not adjusting his sentencing guideline score to a level 6 pursuant to U.S.S.G. § 2K2.1(b)(2) because the firearms which were the subject of the charge were solely possessed for lawful sporting purposes or collection. After review of the record and the arguments presented on appeal, we hereby AFFIRM both the denial of the Motion to Dismiss and the Sentencing Order.

## Procedural Background

David Vertz was indicted on a charge that he, "being a person who had been adjudicated a mental defective and who had been committed to a mental institution, did knowingly possess in and affecting commerce, one or more firearms" in violation of section 922 of the Gun Control Act (18 U.S.C. § 922). Vertz filed a Motion in Limine asking the district court to find, as a matter of law, that he had never been adjudicated as mentally defective, nor had he been committed to a mental institution. The district court denied his motion.

The court found that although Vertz had not been adjudicated mentally defective, he had been committed to a mental institu-tion for purposes of the federal Gun Control Act. Subsequently, Vertz entered into a conditional plea agreement whereby he pled guilty to the charge but preserved his right to appeal the denial of his Motion to Dismiss.

The district court sentenced Vertz within the guidelines for a Total Offense Level 15, Criminal History Category II to a term of imprisonment of 24 months with a rec-ommendation that he receive mental health treatment at an appropriate facility, and to a two year term of supervised release upon termination of his imprison-ment.

## The Standard of Review

A "district court's factual findings are reviewed for clear error while its legal conclusions are reviewed *de novo.*" *United States v. Roberts,* 223 F.3d 377, 380 (6th Cir.2000); *see also, United States v. Owusu,* 199 F.3d 329, 337 (6th Cir.2000). When reviewing a Motion to Dismiss, where the defendant is arguing that as a matter of law the undisputed facts do not constitute the offense charged in an indict-ment, the Court is reviewing a question of law, not fact. *See, e.g., U.S. v. Bowman,* 173 F.3d 595 (6th Cir.1999). The parties in this case agree on all of the relevant facts and have submitted a joint appendix which contains all of the facts considered by this Court. The only question present-ed in the Motion to Dismiss was whether those facts establish a violation of 18 U.S.C. § 922 as a matter of law. Thus, our review of the district court's denial of the Defendant's Motion to Dismiss is *de novo.*

18 U.S.C. § 3742 instructs that "[t]he court of appeals shall give due regard to

---

* The Honorable Donald C. Nugent, United States District Judge for the Northern District of Ohio, sitting by designation.

the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts." Determination of whether the firearms at issue in this case were used solely for sporting or collection purposes is a question of fact. *United States v. Morrison*, 983 F.2d 730, 732 (6th Cir.1993); *United States v. Lorenzo*, 1991 U.S.App. LEXIS 30211 (6th Cir.1991). Therefore, we review the sentencing issue under the clearly erroneous standard. *Id.* A finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Perez*, 871 F.2d 45, 48 (6th Cir.1989).

### Factual Background

For purposes of evaluating the Defendant's motion to dismiss, we take the facts presented in the Joint Appendix as true.

### A. *The Hospitalization*

In September of 1988, Vertz voluntarily admitted himself to a private hospital, McLaren Hospital Psychiatric Unit ("McLaren"), for psychiatric care. During his stay, Vertz became agitated and began threatening the staff, threatening to commit suicide, and threatening to leave the hospital against medical advice. Based on Vertz's behavior, a registered nurse at McLaren filed a petition for involuntary hospitalization with the probate court. The petition alleged that Vertz was mentally ill and requested that the court find him to be "a person requiring treatment and that until the hearing [he] be hospitalized." (App. at 81–82).

The same day, Dr. Dong Ho Yoo, M.D., a psychiatrist at McLaren examined Vertz and, pursuant to M.C.L. § § 330.1430 executed a Probate Court Physician's Certificate stating that Vertz "is mentally ill" and has "other drug dependence." (App. at 83). Dr. Yoo diagnosed Vertz with "borderline personality and multiple substance abuse." Dr. Yoo also certified that Vertz could "reasonably be expected within the near future to intentionally or unintentionally seriously physically injure" himself and that "as a result of mental illness [Vertz was] unable to understand the need for treatment." Dr. Yoo concluded that Vertz was a person requiring treatment, that he met the criteria for judicial admission.

On the basis of petition and the supporting clinical certification, Vertz was admitted to Ypsilanti Regional Psychiatric Hospital ("YRPH") where he stayed for five days. On his third day, Dr. Duncan J.J. Magoon, M.D., a psychiatrist at YRPH met with Vertz and filed a Physician's Certificate with the probate court. Dr. Magoon determined that Vertz was mentally ill, was likely to injure himself, and that due to a stress induced eating disorder he was unable to attend to his own basic physical needs. (App. at 91). Dr. Magoon also found that due to mental illness, Vertz was unable to understand the need for treatment, denied any need for hospitalization and had refused recommended drug abuse treatment.

The probate court ordered a report on alternative treatments from the Genessee Co. Community Mental Health Department ("Mental Health Dept."). Neither this report, nor the final order of the probate court denied a need for hospitalization. The probate court found that Vertz was mentally ill and that he required treatment. Although the court's final order was for a 90 day alternative treatment program, it appears from the record that the alternative treatment was to include a

period of inpatient care at a private hospital.[1] Vertz was not released on his own recognizance, but was transferred from the state designated hospital, YRPH to McLaren, a private hospital.

Vertz has been diagnosed over the years with a variety of depressive disorders and personality disorders.

## B. *The Firearms*

In January of 2000, agents of the Bureau of Alcohol, Tobacco and Firearms ("ATF") were notified that Vertz was suspected of illegally possessing firearms after having been adjudicated mentally ill. Pursuant to a warrant, ATF agents arrested Vertz and searched his home. The search uncovered 17 firearms and several boxes of ammunition. Fourteen of the firearms were shotguns or rifles; three were handguns. Four of the firearms were found loaded.

An ATF agent present during the search was of the opinion that all of the fourteen shotguns and rifles were of the type that would commonly be possessed for lawful sporting purposes and/or collection. He also stated that it would not be unusual to have the types of handguns that were found for use in target shooting and/or home protection. Vertz claimed that he kept the firearms for hunting and target shooting and as collectors items to pass onto his nephew.

All but one of the firearms were locked in a large gun safe. One, a Glock, model 23, .40–caliber handgun, was found loaded sitting on a table in the living room. Vertz told agents that he kept a handgun out, and sometimes carried one on walks to protect himself against bears. According to a local law enforcement officer it is reasonable to carry a firearm as protection against bears in that area.

After his arrest but before his plea, Vertz was stopped for driving while impaired. When searched, he was found to be carrying four concealed knives, one of which, due to its length, was illegal.

Vertz was sentenced in October 2000. Both the government and defense counsel agreed to the appropriateness of an offense level reduction to level 6 under § 2K2.1(b)(2) on the belief that the firearms were possessed for legal sporting or collection purposes. The district court denied the reduction. The court held that in order for the reduction to apply, the guidelines require that the firearms be used "solely" for lawful sporting or collection. Because Vertz kept one handgun loaded and out on a living room table, and he admitted to using at least one of the guns for protection against bears, he did not use them "solely" for sport or collection and therefore the reduction was not warranted. The district court also considered Vertz's history of substance abuse, mental health problems and carrying concealed weapons and decided that these factors added to an inference that Vertz did not possess the firearms "solely" for sporting or collection purposes.

## Analysis

### A. *Denial of Motion to Dismiss*

Relative to the Motion to Dismiss, the only issue on appeal is whether Vertz has ever been "committed to a mental institution" as contemplated under the firearms statute, 18 U.S.C. § 922(g)(4). The question is one of federal law. *See, e.g., United States v. Chamberlain,* 159 F.3d 656, 660 (1st Cir.1998). Unfortunately, the fire-

---

**1.** The order itself is woefully sparse and incomplete. It fails to provide the details necessary to define the ordered treatment and it appears the probate court failed to check necessary comments on the pre-set form to memorialize its findings.

arms statute does not define the term "committed to a mental institution." *See* 18 U.S.C. §§ 921, 922. Because commitments are generally conducted pursuant to state law, federal courts often look to state law to help determine whether a commitment has occurred. *See, e.g., United States v. Waters,* 23 F.3d 29 (2d Cir.1994), *cert. denied,* 513 U.S. 867, 115 S.Ct. 185, 130 L.Ed.2d 119 (1994); *United States v. Hansel,* 474 F.2d 1120, 1122–23 (8th Cir. 1973). However, state law requirements are not conclusive. After taking into account the state law provisions on commitment, we must ensure that our interpretation of the statute remains consistent with federal policy. *See Waters,* 23 F.3d at 31.

Under Michigan state law any adult may file a petition with the probate court asserting that someone "is a person requiring treatment." MCL. § 330.1434. The petition must offer facts in support of the assertion. *Id.* Under most circumstances, the petition must also be accompanied by a clinical certification from a physician or a licensed psychologist. *Id.* When a petition and clinical certification have been executed, a state designated hospital can involuntarily admit an individual without a court order pursuant to M.C.L. § § 330.1423.[2]

Once hospitalized under section 330.1423, a patient must be examined by a psychiatrist within 24 hours (excluding legal holidays). MCL § 330.1430. If the psychiatrist does not certify the patient, the patient is to be released immediately. *Id.* If the psychiatrist does certify the patient, the patient will remain hospitalized until a court hearing can be convened. *Id.*

It appears from the record that Vertz was not examined by a psychiatrist at YRPH within 24 hours of his admission as required by M.C.L. § § 330.1434.[3] Therefore, under the strict terms of the Michigan statutes, he should have been released immediately after the 24 hour period had expired. See M.C.L. § § 330.1430.[4] Vertz was not released. He was examined by a psychiatrist on his third day of hospitalization. The psychiatrist certified that Vertz was in need of treatment, was a danger to himself, and was in denial about his need for treatment. Later, the probate judge found him to be mentally ill and in need of treatment.

It is clear that interpretation of the firearms statute is a federal question, even when its terms refer to conditions which are traditionally defined by the states. "In the absence of a plain indication to the contrary, . . . It is to be assumed when Congress enacts a statute that it does not

---

**2.** The district court originally held that Vertz was admitted pursuant to M.C.L. § § 330.1423. The government requested a correction of the record to specify that the admission took place pursuant to M.C.L. § § 330.1424 instead. Vertz agreed, and the district court entered the correction. However, M.C.L. § § 330.1424 does not provide for hospitalization. This section merely sets forth the requirements for a petition for hospitalization. MCL § 330.1423 provides the authority for using the petition to obtain a pre-hearing involuntary admission. We assume, therefore, that Vertz was admitted under the provisions of M.C.L. § § 330.1423 as the district court originally stated.

**3.** Although Vertz was not timely examined and a second clinical certification was not filed within the statutory timeframe, neither party has raised this issue on this appeal. Therefore, any collateral consequences of this failure are not before the Court at this time.

**4.** MCL § 330.1430 provides that "[i]f a patient is hospitalized under section 423, the patient shall be examined by a psychiatrist as soon after hospitalization as is practicable, but not later than 24 hours, excluding legal holidays, after hospitalization . . . . If the psychiatrist does not certify that the patient is a person requiring treatment, the patient shall be released immediately."

intend to make its application dependent on state law." *NLRB v. Natural Gas Utility Dist.*, 402 U.S. 600, 603, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971) (citations omitted). To give preclusive effect to each state's individual definition of terms in the firearms statute would be to frustrate one of the main purposes of the law, which is to provide for national uniformity in the application of firearms restrictions. *See, e.g., Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 112, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983). "As in all cases of statutory construction, our task is to interpret the words of [the statute] in light of the purposes Congress sought to serve." *Id.* at 118, 103 S.Ct. 986, citing *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 608, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979).

The legislative history of the firearms statute provides some insight into the breadth of the net Congress wished to cast with its prohibitions. Congress intended to apply the firearms prohibition to those who were "mentally unstable" or "irresponsible." *United States v. Chamberlain*, 159 F.3d 656 (1st Cir.1998), citing H.R. 17735, 90th Cong., 2d Sess. (1968), 114 Cong. Rec. 21780, 21791, 21832, and 22270 (1968). "Congress considered the mere risk or potential for violence or irresponsible use sufficient reason to prohibit certain categories of persons from possessing firearms." *Id.* at 660. The Supreme Court has acknowledged and accepted that Congress' intent was to provide a "broad prophylactic" protection. *Dickerson*, 460 U.S. at 118, 103 S.Ct. 986. That intent would not be served by defining commitment so narrowly that it does not include a five day involuntary admission to a state designated psychiatric hospital, supported by certificates from two separate examining psychiatrists who both concluded that the patient was (1) in need of treatment, (2) likely to be a danger to himself or others and (3) not able to appreciate his need for treatment.

Vertz argues that a "commitment" under 18 U.S.C. § 922(g)(4) requires a formal adjudication by a court, citing *United States v. Giardina*, 861 F.2d 1334 (5th Cir.1988). *Giardina* which does lend support to Vertz's argument relies in turn on *United States v. Hansel*, 474 F.2d 1120, 1123 (8th Cir.1973) for the following proposition: "[t]here is nothing in 18 USCS § 922(H)[now § 922(g)] which indicates an intent to prohibit the possession of firearms by persons who have been hospitalized for observation and examination, where they have been found not to be mentally ill." While this may be true, and may, in fact, provide an essential safeguard against arbitrary or unfounded commitments, it has no application in this case. Vertz was found to be mentally ill, both by an examining psychiatrist at the state designated hospital, and by the probate court.

We also believe that *Giardina* placed too much reliance on the label affixed to the involuntary hospitalization procedures by the state of Louisiana. The *Giardina* court, in finding that no formal commitment had occurred, relied heavily on the fact that Louisiana changed the label of its emergency hospitalization procedures from a "Coroner's Commitment" to an "Admission by Emergency Certificate." The court reasoned that because an emergency admission was no longer labeled a commitment by the Louisiana Mental Health Law, it must not be a commitment for purposes of the federal firearms statute.

We do not agree that the federal interpretation of the term "commitment" should be so reliant on the terminology chosen by an individual state. To accept such a proposition would be to sacrifice any hope of a uniform application of the federal statute. Any state could expand or

limit the scope of the federal firearms statute at will by merely changing the labels they place on their involuntary hospitalization procedures. We find the analysis and reasoning set forth in *United States v. Waters*, 23 F.3d 29 (2nd Cir.1994) and *United States v. Chamberlain*, 159 F.3d 656 (1st Cir.1998) to be more persuasive and more in line with the Congressional intent of the firearms statute.

In *Waters*, the Second Circuit held that a person can be "committed" as the term is used in the Gun Control Act, without need of a judicial hearing or formal order of commitment. In that case, as in this one, the patient was involuntarily hospitalized upon the certification of two examining physicians who determined that the patient required treatment, was likely to be a danger to himself or others, and did not recognize the need for treatment. 23 F.3d at 29. Similarly, in *Chamberlain*, the court held that a five day emergency involuntary admission, without judicial involvement, constituted a commitment for purposes of the Gun Control Act. 159 F.3d at 656. Both Waters and Chamberlain, like Vertz, also eventually avoided a formal judicial order of commitment to a state designated hospital by agreeing to treatment and forgoing a full evidentiary hearing.

We agree that a judicial determination is not always necessary in order to have a "commitment" for purposes of the firearm statute. Congress specifically required an "adjudication" when a mental defect is the disabling circumstance that prohibits someone from possessing firearms, but it did not specify any requirement of judicial involvement when commitment to a mental health institution is the disabling circumstance. 18 U.S.C. § 922(g)(4). Considering the broad protective purpose of the Act and considering that Congress clearly knew how to specify when an adjudication

was required, it does not appear that Congress intended to require all commitments to arise from official judicial orders.

While a judicial order may not be necessary, we do believe that some degree of formal corroboration of the assertions set forth in a petition for involuntary admission is required to transform an emergency admission into a commitment for purposes of the federal firearm statute. In this case, Michigan law provided that corroboration would take the form of a second clinical certificate to be completed by an examining psychiatrist subsequent to the admission. For extended commitments (beyond seven days), a judicial hearing is also required. Therefore, for purposes of interpreting the federal firearm statute, we consider the fact that a psychiatrist did examine Vertz after his admission to YRPH, and did certify that Vertz was a person who required treatment, that he was a danger to himself, and that he did not recognize the need for treatment. This certification, though untimely under Michigan law, provides the necessary affirmation of the validity of the involuntary admission, rendering it a "commitment" for purposes of the firearm statute.

There is no dispute that Vertz was involuntarily admitted to a hospital on the basis of a valid petition and a physician's certificate which declared him to be a person in need of treatment. There is no dispute that he remained involuntarily detained for five days. It is also undisputed that during his detention, a second psychiatrist examined Vertz and declared him to be a person in need in treatment. Two doctors, from different institutions, agreed that Vertz was a potential danger to himself or others and that he did not recognize the need for his admission. Subsequently the probate court also declared Vertz to be a

person in need of treatment and ordered him to undergo continuing treatment.[5]

██ Therefore, we conclude that under the above facts, the five days Vertz spent at YRPH following his involuntary admission constituted a "commitment" for purposes of 18 U.S.C. § 922(g)(4). The district court's denial of Vertz's Motion in Limine to Dismiss the Indictment is, therefore, AFFIRMED.

## B. *Appropriateness of Sentence*

There is no doubt that there was evidence to suggest that Vertz did possess firearms for sporting purposes and collection. However, this does not mandate a finding that all seventeen firearms were kept solely for those purposes. At sentencing, Vertz had the burden of proving, by a preponderance of the evidence, that a reduction in the guidelines offense level was warranted. *See Morrison*, 983 F.2d at 732; *United States v. Rodriguez*, 896 F.2d 1031, 1033 (6th Cir.1990). The government did not need to present direct evidence to refute an allegation that a firearm was used solely for sporting purposes or collection.

██ It is sufficient if there are reasonable inferences that can be made, looking at the surrounding circumstances, that the firearm was used or was intended to be used for another purpose. *See Morrison*, 983 F.2d at 733. In order to defeat application of the sporting/collection reduction, it is enough that Vertz used at least one gun from his collection for perceived self-defense purposes. *See, e.g. United States v. Wilson*, 878 F.2d 921, 924 (6th Cir.1989);

*United States v. Kaplan*, 16 F.3d 1222, 1994 WL 12313 (6th Cir.1994), unreported.

The Sentencing Guidelines direct the trial court to look at the surrounding circumstances, including "the number and type of firearms, the amount and type of ammunition, the location and circumstances of possession and actual use, [and] the nature of the defendants's criminal history ...." Sentencing Guidelines § 2K2.1(b)(2), app. note 10. In making its determination, the district court in this case took into account the circumstances surrounding Vertz's possession of his Glock model 23 .40–caliber handgun, including: (1) the handgun was found loaded, (2) the handgun was found in plain view on a coffee table in Vertz's living room, and (3) Vertz admitted to using the handgun for self-defense (i.e. as protection against bears). The district court also considered the fact that Vertz had a history of alcohol abuse and carrying concealed weapons (knives) that, combined with his antisocial and paranoid personality disorders, supports an inference that he may have kept the Glock for reasons not solely related to sporting or collection.

Taking these factors into account, it is was reasonable for the district court to conclude that Vertz did not possess the Glock handgun solely for sporting purposes or collection. As the district court had a reasonable basis for its finding that Vertz was not entitled to a reduction on the basis that all of the weapons at issue were kept solely for sporting purposes or collection, we find that there is no clear error and the sentence is appropriate under the guidelines. The sentencing order is, therefore, AFFIRMED.

---

5. Although we offer no opinion as to whether the post-hearing treatment in this case might be considered a commitment under the Gun Control Act, the probate court's finding lends further support to the conclusion that Vertz's five day pre-hearing involuntary admission was a valid commitment based on well founded opinions.

## Conclusion

For the foregoing reasons, we AFFIRM the Defendant–Appellant's conviction and sentence.

RALPH B. GUY, Jr., Circuit Judge, concurring.

I concur in Judge Nugent's opinion, but would add an additional reason in support of affirmance on the "involuntary commitment" issue.

It was defendant's position that although he had been involuntarily committed in 1988 for five days, he was not held after that period, but was released to pursue private treatment. The district judge carefully considered defendant's arguments and rejected them in a written opinion. In sum, the court concluded that the so-called private treatment was, in fact, ordered by the probate court and had there not been this viable alternative, defendant would have been ordered to remain committed in the Ypsilanti State Hospital. It is understandable that the State of Michigan does not want to bear the expense of taking care of involuntarily committed persons if there is an acceptable alternative that results in the individual committed or his insurer assuming the cost of treatment. The only difference in the two types of commitment at issue here was who was going to bear the cost of treatment. As the trial judge concluded, both were involuntary.

CLAY, Circuit Judge, dissenting.

Because I believe that the majority opinion reaches an improper conclusion in determining that Defendant had been "committed to a mental institution" for purposes of § 922(g)(4), I respectfully dissent. Neither of Defendant's two temporary involuntary hospitalizations, one in 1988 and another in 1993, constitute Defendant having been committed to a mental institution under Michigan law. I agree with Defendant's arguments, supported by *United States v. Hansel*, 474 F.2d 1120 (8th Cir.1973) and *United States v. Giardina*, 861 F.2d 1334 (5th Cir.1988), to the effect that temporary or emergency detentions for treatment of mental disorders or difficulties, which do not lead to formal commitments under state law, do not constitute the kind of commitment envisioned by 18 U.S.C. § 922. Not only does the Michigan statutory scheme require that a "commitment" not occur until the probate court orders a person into hospitalization or alternative treatment, but Michigan law requires that a patient hospitalized pursuant to M.C.L. § § 330.1434, such as Defendant, must be examined by a psychiatrist within 24 hours. In the absence of the required examination, Defendant should have been released after the 24–hour period expired. Therefore, the hospitalization which the majority would utilize to satisfy the requirement that Defendant be committed to a mental institution is one which occurred in violation of Michigan law. Consequently, I would reverse the district court and order that Defendant's motion to dismiss be granted; there then would be no need to address the sentencing issues.