USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1324

 UNITED STATES,

 Appellee,

 v.

 RICHARD W. CHAMBERLAIN,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MAINE

 [Hon. Morton A. Brody, U.S. District Judge]

 Before

 Torruella, Chief Judge,
 
 Campbell, Senior Circuit Judge, 
 
 and Stahl, Circuit Judge. 
 
 

 Jeffrey M. Silverstein, with whom Billings & Silverstein was
on brief for appellant.
 Margaret D. McGaughey, Assistant United States Attorney, with
whom Jay P. McCloskey, United States Attorney, and James L.
McCarthy, Assistant United States Attorney, were on brief for
appellee.

 

November 3, 1998

 CAMPBELL, Senior Circuit Judge. Richard Chamberlain
appeals from his conviction in the United States District Court for
the District of Maine on one count of possession of a firearm
pursuant to 18 U.S.C. 922(g)(4), which makes it unlawful for any
person who has been "committed to a mental institution" to possess
any firearm in interstate commerce. Under Maine law, Chamberlain
had earlier been involuntarily admitted for five days, on an
emergency basis, to a Maine mental hospital. Chamberlain moved to
dismiss the federal information, contending that his involuntary
emergency admission was not, as a matter of law, a "commitment" to
a mental institution as required for conviction under 922(g)(4). 
The district court denied the motion. Chamberlain entered a
conditional guilty plea, reserving his right to challenge on appeal
the denial of his motion to dismiss. He was sentenced to five
years probation and ordered to pay a $100 assessment. This appeal
followed. We affirm. 
 I.
 On June 25, 1996, Chamberlain was involuntarily admitted,
on an emergency basis, to the Acadia Hospital in Bangor, Maine
pursuant to an application filed under a Maine statute, 34-B
M.R.S.A. 3863(1)-(3). In the application seeking Chamberlain's
involuntary admission, a clinician at Acadia stated that
"Chamberlain has a mental illness and, due to mental illness, poses
a likelihood of serious harm, on the basis that he put a loaded gun
to his head and threatened his wife." The application further
stated that "suitable resources for care and treatment are
unavailable in the community." Chamberlain was examined on June
25, 1996, by a licensed physician, who certified pursuant to
section 3863 that Chamberlain posed a danger of serious harm due to
mental illness because he "held a gun to his head tonight" and
constituted a "[d]anger to [him]self and others." A judge of the
Maine district court reviewed and endorsed the application and
certification as being prepared in accordance with law, and ordered
that Chamberlain be transported and admitted to Acadia for no more
than five days, the maximum length of an emergency detention under
section 3863. 
 After Chamberlain had been admitted to Acadia, a second
physician examined him and completed a "24-Hour Certification
Form." On the form, the physician certified that he had "examined
[Chamberlain] and in my opinion the patient is mentally ill, and,
due to his [] mental illness, poses a likelihood of serious harm to
himself [] or others if discharged at this time." As grounds for
the certification, the physician stated that Chamberlain had "put
a gun to his head last evening with suicidal ideation" and "remains
distraught today and constitutes a danger to [him]self." 
 A patient who has been detained for five days pursuant to
section 3863 may thereafter remain at the mental hospital if (1)
the patient voluntarily admits himself, see 34-B M.R.S.A. 3831,
or (2) the chief administrative officer of the mental hospital
obtains from the state district court an "involuntary commitment
order," see 34-B M.R.S.A. 3863 (5)(B), 3864. After his initial
five-day emergency detention, Chamberlain voluntarily admitted
himself to Acadia on or about June 30, 1996, remaining there until
his release on July 8, 1996. The chief administrative officer made 
no application in his case for an "involuntary commitment order." 
 On May 19, 1997, a police officer received a
suicide/attempt to locate report from Chamberlain's brother. 
Chamberlain's brother told the officer that Chamberlain was upset
over the breakup of his marriage, had stated that he had nothing to
live for, and was suicidal. The officer located Chamberlain's
pickup truck in an airport parking lot. Inside the truck were a
loaded Remington .270 caliber rifle, a box of .270 caliber
ammunition, and a Savage 30-30 caliber rifle. These items, which
were manufactured outside the state of Maine, were seized and
Chamberlain was arrested and charged in the federal district court
with violation of 18 U.S.C. 922(g)(4). 
 Chamberlain filed a motion to dismiss the information on
the ground that he had not, as a matter of law, been "committed to
a mental institution" within the meaning of 922(g)(4). The
federal district court denied the motion, and issued findings of
fact and conclusions of law. 
 Chamberlain entered a conditional plea of guilty under
Fed. R. Crim. P. 11(a)(2) to one count of unlawful possession of a
firearm, reserving his right to appeal from the district court's
denial of his motion to dismiss. The court sentenced Chamberlain
to five years' probation and a mandatory $100 assessment.
 II. 
 This appeal raises a single legal issue: Whether
Chamberlain's involuntary admission pursuant to 34-B M.R.S.A. 
 3863 constituted a "commitment" for purposes of conviction under
18 U.S.C. 922(g)(4). The federal district court held that
Chamberlain's five-day involuntary admission, which was followed by
his continued admission on a voluntary basis, constituted a
"commitment" for purposes of the federal firearms ban. Chamberlain
contends that his five-day emergency detention under Maine law fell
short of amounting to a "commitment," and that only detention under
an involuntary commitment order obtained pursuant to section 3864,
note 3, supra, would have constituted a "commitment" allowing
conviction under the federal firearms statute. We review de novothe district court's interpretation of the term "commitment." SeeUnited States v. Ortiz, 146 F.3d 25, 28 (1st Cir. 1998). 
 We begin with the language of 18 U.S.C. 922(g)(4), part
of the federal Gun Control Act of 1968. Section 922(g)(4) states
that it shall be unlawful for anyone
 (4) who has been adjudicated as a mental
 defective or who has been committed to a
 mental institution; 
 . . .
 to ship or transport in interstate or foreign
 commerce, or possess in or affecting commerce,
 any firearm or ammunition; or to receive any
 firearm or ammunition which has been shipped
 or transported in interstate or foreign
 commerce.

The Gun Control Act does not define the phrase "committed to a
mental institution." See 18 U.S.C. 921, 922; see also United
States v. Waters, 23 F.3d 29, 31 (2d Cir.), cert. denied, 513 U.S.
867 (1994). 
 Determination of whether Chamberlain was so "committed"
is a question of federal law. See Waters, 23 F.3d at 31; United
States v. Giardina, 861 F.2d 1334, 1335 (5th Cir. 1988). Cf.Dickerson v. New Banner Inst., Inc., 460 U.S. 103, 111-12 (1983)
("Whether one has been 'convicted' within the language of the gun
control statutes is . . . a question of federal . . . law, despite
the fact that the predicate offense and its punishment are defined
by the law of the State.") (citation omitted). While we are
determining a question of federal law, we "may seek guidance from
state law," Giardina, 861 F.2d at 1335, since "commitment" occurs
pursuant to procedures required by state law. See United States v.
Hansel, 474 F.2d 1120, 1122-23 (8th Cir. 1973). After taking into
account whatever guidance state law may offer, our interpretation
must in any case be consistent with federal policy. See Waters, 23
F.3d at 31; Giardina, 861 F.2d at 1335. Accordingly, we examine
both Maine's statutory involuntary hospitalization procedures and
the federal gun control policy embodied in 922(g)(4). 
A. Maine's Involuntary Hospitalization Law
 Under Maine law, a person may be "admitted to a mental
hospital, on an emergency basis," upon written application stating
the applicant's belief that the person is mentally ill and, because
of his illness, "poses a likelihood of serious harm." 34-B
M.R.S.A. 3863(1). The Maine statute elsewhere describes such an
emergency admission as an "involuntary admission" and it is clear
that a person so admitted cannot leave the institution and is under
its control. The application must be accompanied by a certificate
signed by a health care professional who has examined the patient
not more than three days before the date of admission and
determined that the patient "poses a likelihood of serious harm." 
Id., 3863(2). 
 The application and the accompanying certificate must be
reviewed by a Justice of the Superior Court, Judge of the District
Court, Judge of Probate or a justice of the peace. See id., 
 3863(3). If the judicial officer determines that the application
and certificate are "regular and in accordance with the law," id.,
the statute requires that he or she endorse them. A patient
admitted on an emergency basis may not be detained for more than
five days. See id., 3863(5)(B)(2). 
 Once a patient is involuntarily admitted, section 3863
requires that the patient be examined "as soon as practicable." 
See id., 3863(7). If this post-admission examination is not held
within twenty-four hours after the time of admission, or if a
health care provider fails or refuses after the examination to
certify that the patient is mentally ill and, due to his mental
illness, "poses a likelihood of serious harm," the patient must be
immediately discharged. See id., 3863(7)(C).
 After the initial five-day involuntary hospitalization,
a patient may elect to be "informally admitted" for a longer
period, provided the chief administrative officer of the hospital
determines that admission of the patient on an informal basis is
appropriate. See id., 3863(5)(A). This informal, voluntary
admission may be indefinite. If the patient does not choose to be
informally admitted, or the chief administrative officer determines
that admission of the patient on an informal basis is not
appropriate, and the chief administrative officer believes that
further hospitalization is warranted, the chief administrative
officer "may seek involuntary commitment" of the patient. See id.,
 3863(5)(B). 
 To secure a further judicial "involuntary commitment" at
this later stage, the chief administrative officer must file "[a]n
application to the District Court to admit a person to a mental
hospital." See id., 3864(1). The patient is entitled to notice
of the proceedings and of his or her right to retain counsel. 
Id., 3864(4). If neither the patient nor anyone else provides
counsel, the statute requires that the court appoint counsel for
the patient. Id., 3864(5)(D). The patient must be examined by
two examiners, each of whom must be a licensed physician or a
licensed clinical psychologist. Id. One of the examiners must be
a physician or psychologist chosen by the patient or the patient's
counsel. Id. If the report of the examiners is to the effect that
the person is mentally ill or poses a likelihood of serious harm,
the patient is entitled to a hearing before the district court, at
which the patient, the applicant, and others are afforded an
opportunity to appear and testify. Id., 3864(5)(C). At the
hearing, the court "shall receive all relevant and material
evidence which may be offered in accordance with accepted rules of
evidence and accepted judicial dispositions." Id. 
 To issue a commitment order at this stage, the district
court must find, by clear and convincing evidence, that the person
is "mentally ill" and "poses a likelihood of serious harm." Id., 
 3864(6)(A)(1). The court must also find that inpatient
hospitalization is the best available means for treatment and that
the proposed individual treatment plan is satisfactory. Id., 
3864(6)(A)(2)-(3). Upon making these findings, the court may order
the patient committed for a period not to exceed four months in the
first instance and not to exceed one year after the first and all
subsequent hearings. Id., 3864(7). 
B. Federal Policy Relating to the Possession of Firearms
 Congress' intent in enacting 18 U.S.C. 922 was "to keep
guns out of the hands of those who have demonstrated that they may
not be trusted to possess a firearm without becoming a threat to
society." Dickerson, 460 U.S. at 112 (quoting Lewis v. United
States, 445 U.S. 55, 63 (1980)). In Huddleston v. United States,
415 U.S. 814 (1974), the Supreme Court stated:
 The principal purpose of the federal gun
 control legislation . . . was to curb crime by
 keeping 'firearms out of the hands of those
 not legally entitled to possess them because
 of age, criminal background, or incompetency.'

415 U.S. at 824 (citation omitted). 
 According to the Supreme Court, Congress in enacting the
firearms ban "sought to rule broadly." Dickerson, 460 U.S. at 112
(quoting Scarborough v. United States, 431 U.S. 563, 572 (1977)). 
See also id., at 116 ("Congress was reaching far and was doing so
intentionally."); Huddleston, 415 U.S. at 824(stating Congress was
concerned with general availability of firearms "to those whose
possession thereof was contrary to the public interest"). 
Consistent with this broad purpose, Congress did not limit the
firearms prohibition only to those who had already committed
dangerous or violent acts. See, e.g., 18 U.S.C. 922(n)
(prohibiting possession of firearms by any person under indictment
for crime punishable by imprisonment for a term exceeding one year,
whether crime was violent or not); id., 922(g)(1) (prohibiting
possession of firearms by felons, whether or not convicted of a
crime of violence). See also 18 U.S.C. 922(g)(3)(prohibiting
possession of firearms by unlawful users of controlled substances);
id., 922(g)(5) (illegal aliens); id., 922(g)(7)(citizens who
have renounced their citizenship). 
 The legislative history indicates that Congress intended
to apply the prohibition against the possession or ownership of
firearms by "mentally unstable" or "irresponsible" individuals. 
See H.R. 17735, 90th Cong., 2d Sess. (1968), 114 Cong. Rec. 21780,
21791, 21832, and 22270 (1968). Congress considered the mere risk
or potential for violence or irresponsible use sufficient reason to
prohibit certain categories of persons from possessing firearms. 
See Dickerson, 460 U.S. at 112 n.6 ("Congress' intent in enacting
 922(g) . . . was to keep firearms out of the hands of
presumptively risky people."); Barrett v. United States, 423 U.S.
212, 220 (1976) (legislative history reflects a concern with
"keeping firearms out of the hands of categories of potentially
irresponsible persons"). As for an individual adjudicated a mental
defective or committed to a mental institution, "Congress obviously
felt that such a person, though unfortunate, was too much of a risk
to be allowed firearms privileges." Dickerson, 460 U.S. at 116. 
 In enacting the federal firearms ban, Congress had a
second purpose in mind national uniformity in determinations of
whether a person is within a category covered by the firearms
prohibition. As the Supreme Court has stated, treating the scope
of the ban as a matter of federal law "makes for desirable national
uniformity unaffected by varying state laws, procedures, and
definitions . . ." Dickerson, 460 U.S. at 112. The DickersonCourt noted that giving effect to the intricacies of varying state
statutes would "seriously hamper effective enforcement of [the
firearms ban]." Id., at 121. 
C. "Commitment" Pursuant to 18 U.S.C. 922(g)(4)
 Chamberlain does not deny that Maine's procedural
requirements for an emergency involuntary hospitalization pursuant
to 34-B M.R.S.A. 3863 were met in his case. He contends,
however, that his preliminary five-day involuntary hospitalization,
which was followed by his voluntary admission to the same
institution on an informal basis for an additional eight days, did
not amount to a "commitment" sufficient for conviction under 18
U.S.C. 922(g)(4). He argues that a person can be deemed
"committed" under Maine law for purposes of the federal firearms
ban only after notice and issuance by a state judge of a formal
order of commitment following a full hearing at which the person
has had the opportunity to be heard. 
 As said, Congress itself has not defined the term
"commitment." However, in ordinary usage, "commitment" means "to
place in or send officially to confinement . . . to consign legally
to a mental institution. . . ." See Webster's Third New
International Dictionary (1971). In that sense, Chamberlain's
"involuntary admission" under section 3863 would seem no different
from a "commitment." In urging us to interpret "commitment" so as
to exclude an initial five-day emergency detention, Chamberlain
relies upon the maxim that an "ambiguity concerning the ambit of
criminal statutes should be resolved in favor of lenity." Rewis v.
United States, 401 U.S. 808, 812 (1971); United States v. Bass, 404
U.S. 336, 347 (1971). The rule of lenity serves important goals,
including allowing fair warning as to what conduct is criminal and
punishable, and is "the product of an awareness that legislators
and not the courts should define criminal activity." Huddleston,
415 U.S. at 814. As the Huddleston Court noted, however, "[z]eal
in forwarding these laudable policies . . . must not be permitted
to shadow the understanding that '[s]ound rules of statutory
interpretation exist to discover and not to direct the
Congressional will.'" Id. (quoting United States ex rel. Marcus v.
Hess, 317 U.S. 537, 542 (1943)). "Although penal laws are to be
construed strictly, they 'ought not to be construed so strictly as
to defeat the obvious intention of the legislature.'" Huddleston,
415 U.S. at 814 (quoting American Fur Co. v. United States, 2 Pet.
358, 367 (1829)). We believe that Congress's intent can reasonably
be ascertained in this case and that Chamberlain's restrictive 
interpretation of "commitment" would defeat the "broad prophylactic
purpose," Dickerson, 460 U.S. at 118, of the federal firearms ban. 
 Chamberlain focuses first on the fact that section 3863
of the Maine statute uses only the phrase "involuntary admission"
with respect to the five-day emergency detention in issue, whereas
section 3864 speaks expressly of "commitment" in regard to the
longer-term detention discussed there. He argues that we owe this
difference in terminology "great deference." We find no evidence,
however, that the Maine Legislature consciously used the
"involuntary admission" language to distinguish between that and a
"commitment." To the contrary, the legislature has used the terms
"admission" and "commitment" interchangeably. Section
3864(1)refers to the post-emergency application filed by the chief
administrative officer of the hospital under 3863(5)(B) filed
pursuant to a procedure Chamberlain urges us to interpret as a
"commitment" as an application "to admit" a person to a mental
hospital. This legislative imprecision undermines Chamberlain's
attempt to find an important meaning in the difference in
terminology here. Chamberlain's argument likewise finds no support
in the opinions of the Maine courts concerning the involuntary
hospitalization statutes and their predecessors. The Maine Supreme
Court has at times characterized the initial involuntary
hospitalization under 3863 as a "commitment," see, e.g.,In re
Faucher, 558 A.2d 705, 706 (Me. 1989), and at other times has
characterized the same procedure as one for "emergency
admittance," Sukeforth v. Thegen, 256 A.2d 162 (Me. 1969). 
 Moreover, even if the Maine Legislature had been more
precise in its use of the two terms, we would be faced with the
question of how far to rely upon the language chosen by the state
legislature in interpreting "commitment" for purposes of the
federal firearms ban. We would hesitate to convert a question of
federal law into one solely of state law, as such an approach could
destroy the uniformity Congress sought in enacting section
922(g)(4). State statutes tend to vary widely as to the language
chosen to describe the process of involuntary hospitalization. 
Compare, e.g., Massachusetts General Laws, chapter 123, 
12(e)(referring to a ten-day emergency involuntary hospitalization,
similar to section 3863's five-day detention, as a "commitment")
with 34-B M.R.S.A. 3863(1)(characterizing emergency procedure as
"admission"). Were we to focus solely on whether or not the term
"commitment" is used, a patient in Massachusetts admitted on an
emergency basis would be deemed "committed" for purposes of
conviction under the federal firearms ban, while a patient
involuntarily hospitalized in Maine in identical circumstances
would not. This is precisely the sort of "national patchwork,"
Dickerson, 460 U.S. at 122, Congress sought to avoid in enacting
the firearms ban. 
 In support of his narrow interpretation of "commitment,"
Chamberlain relies primarily upon Giardina and Hansel. In those
cases, the courts indeed relied upon the words chosen by the
respective state legislatures in concluding that no "commitment"
had occurred. In Giardina, petitioner was involuntarily
hospitalized for two weeks pursuant to a Louisiana statute allowing
detention of persons based upon a "Physician's Emergency
Certificate" stating that the person is "mentally ill." The Eighth
Circuit carefully examined the language used by the Louisiana
Legislature in both the then-existing and superseded versions of
the involuntary hospitalization statutes, and concluded that since
no "commitment" as the process had been characterized by the
state legislature had occurred, no "commitment" had taken place
for purposes of the federal firearms ban. 861 F.2d at 1336. In
Hansel, the Fifth Circuit followed a similar course. The court
concluded that since the Texas statute at issue did not
characterize Hansel's involuntary detention as a "commitment," no
"commitment" had occurred pursuant to 18 U.S.C. 922. 474 F.2d at
1122-23. 
 With all respect, we believe that the proper
interpretation of the phrase, "committed to a mental institution,"
should not turn primarily on the label attached by the state
legislature to its procedures, but rather on the substance of those
procedures. Thus, rather than focus on the nuances of state
statutory language in interpreting "commitment," we look at the
realities of the state procedures and construe them in light of the
purposes Congress sought to accomplish by prohibiting firearm
possession by someone who has been "committed to a mental
institution." We ask whether identifying the state's procedures
for involuntary hospitalization as a "commitment" is reasonable and
consistent with the federal policy underlying the firearms ban 
namely, to keep firearms out of the hands of those who, if
permitted to possess them, would pose a risk or potential for harm. 
See Waters, 23 F.3d at 34. 
 For this reason, we respectfully decline to follow the
approach of Giardina and Hansel, the cases on which Chamberlain
primarily relies. Our approach is similar to the analysis of the
Second Circuit in Waters. In Waters, petitioner was involuntarily
hospitalized pursuant to a New York statute similar in many
respects to the Maine statute under consideration. The statute
allowed for the "involuntary admission" of an individual for sixty
days based upon an application of a relative or other qualified
person and a certificate, signed by two physicians, showing that
the physicians had examined the individual within ten days of
admission and determined that he was "mentally ill." Id., at 32. 
The statute provided that during the sixty-day period, the
individual may request a hearing on the question of the need for
involuntary treatment. Id., at 30. At the end of the sixty days,
the patient could be further detained if he voluntarily admitted
himself for an additional period or the director of the mental
health facility obtained a court order authorizing the person's
"continued detention." Id. At the end of the initial sixty-day
period, Waters voluntarily admitted himself for an additional seven
months. No formal court order of "continued detention" was ever
obtained. 
 The Second Circuit held that these procedures, "whether
termed an 'admission' or a 'commitment' [by the legislature] . . .
established 'commitment' procedures under New York state law, and
Waters was 'committed' pursuant to those procedures." Id., at 34. 
The court noted that no formal judicial proceeding was required
under the state statute to detain a person beyond the initial sixty
days a person could voluntarily admit himself to the institution
for an indefinite period. Id., at 34. The court went on to
conclude that deeming the procedures at issue a "commitment" was
consistent with federal gun control policy, which seeks to prohibit
the possession of firearms by "those with a potential for
violence." Id., at 34-35. 
 The procedures followed in this case, whether denominated
as an "involuntary admission" or a "commitment" by the Maine
Legislature, constituted in all functional respects a "commitment"
for purposes of 922(g)(4). Chamberlain was involuntarily
hospitalized based upon an application filed by a clinician at a
mental hospital who stated that Chamberlain had put a loaded gun to
his head and threatened his wife. Prior to admission, Chamberlain
was examined by a physician who certified, as required under Maine
law in order to detain Chamberlain involuntarily, that Chamberlain
suffered from a mental illness and posed a danger to himself and
others. A judicial officer reviewed the application and the
certification of the first physician, determined that they were
prepared in accordance with law, and ordered that Chamberlain be
detained in a mental institution for five days. A second physician
examined Chamberlain within twenty-four hours of admission and
certified that Chamberlain suffered from a mental illness and posed
a danger to himself and others. During the five-day emergency
detention, Chamberlain was not free to go as he pleased. In all
respects, then, we conclude that Chamberlain was formally
"committed" to a mental institution. See H.R. Rep. No. 1577, 90th
Cong., 2d Sess.(1968), reprinted in 1968 U.S.C.C.A.N. 4410, 4421
(noting that it would be unlawful to possess a firearm under the
statute if one has been formally committed, for example, pursuant
to court order). 
 We reject Chamberlain's argument that a person is not
"committed" for purposes of the federal firearms ban unless all of
the requirements set forth in section 3864 including provision of
counsel, a full-blown adversary hearing, a finding by clear and
convincing evidence that the person suffers from a mental illness,
and a judicial order of commitment are satisfied. Persons held
under section 3863 are involuntarily detained as surely as are
those held for longer periods under the more elaborate procedures
of section 3864. Moreover, to treat section 3864 detention as the
only "real" commitment would come close to limiting "commitments"
to cases in which a person has actually been "adjudicated a mental
defective" after an adversary hearing. 18 U.S.C. 922(g)(4)
separately bans persons who have been "adjudicated a mental
defective" from owning firearms, in addition to those who have been
"committed to a mental institution." In denying firearms to those
"committed to a mental institution," Congress appears to have cast
a wider net to "maximize the possibility of keeping firearms out
of the hands of [,among others, persons suffering from mental
illness]." See 114 Cong. Rec. 21784 (1968) (remarks of Congressman
Celler). Requiring an adversary hearing and a judicial finding of
mental illness would conflate two of the categories Congress
singled out for the firearms prohibition. 
 We repeat that Congress deemed the potential for misuse
of firearms or violence sufficient to bring various categories of
individuals within the firearms ban. The legislative history
nowhere suggests the need for showing "clear and convincing
evidence" of dangerousness with regard to other categories of
individuals placed within the firearms ban including those under
indictment, convicted felons, drug abusers, illegal aliens, and
those who have renounced their citizenship. To require a full-
scale adversary proceeding and a finding, by clear and convincing
evidence, that a person is mentally ill and poses a likelihood of
harm to himself or others before giving effect to the firearms ban
would undermine Congress's judgment that risk or potential, not
likelihood, probability, or certainty, of violence is all that is
required.
 Nor does it appear that Congress intended that only
persons conclusively found to be suffering from mental illnesses or
difficulties after having been afforded the fullest possible
panoply of due process rights be deemed to have been "committed to
a mental institution" for purposes of the firearms ban. That
level of formality is not required for most of the categories
Congress identified as within the firearms ban, including those who
have merely been indicted for a crime. See 18 U.S.C. 922(n). 
When Congress has intended that a particular status triggering the
firearms ban be conditioned upon notice and the opportunity to be
heard, along with other procedural rights, it has stated so
explicitly. In 1994, for example, Congress amended the Gun Control
Act to include within the firearms prohibition persons 
 subject to a court order that . . . restrains
 such person from harassing, stalking, or
 threatening an intimate partner of such person
 or child of such intimate partner or person,
 or engaging in other conduct that would place
 an intimate partner in reasonable fear of
 bodily injury to the partner or child . . .

18 U.S.C. 922(g)(8), Pub. L. 103-322, 110401(c). Before the
ban can be applied against such persons, however, Congress required
that several procedural rights be provided, including a hearing at
which the person has the opportunity to participate and a judicial
finding that such person "represents a credible threat to the
physical safety of such intimate partner or child." See 
922(g)(8)(A),(C). See also 18 U.S.C. 922(g)(1) (imposing the ban
against those convicted of felony). Congress imposed no such
procedural requirements with respect to determining those
"committed to a mental institution." 
 A further reason to find that the meaning Congress
envisioned for commitment encompasses Maine's five-day involuntary
admission procedure is that many patients of the type Congress
would not want to possess firearms may have undergone, like
Chamberlain, the five-day emergency detention under section 3863
followed by a voluntary stay at the institution, rather than 
followed by a further involuntary detention there under section
3864. The initial five-day commitment requires, in both
situations, medical findings of dangerousness, although
Chamberlain's treatment at Acadia Hospital was thereafter prolonged
beyond the five days on a voluntary basis, permitting his continued
treatment without need for officials to request his additional
involuntary commitment. Were we to hold that the initial emergency
commitment was an insufficient basis for bringing him under the
federal weapons ban, Chamberlain and many like him would be
exempted from the ban even though, in many instances, their mental
condition and potential for dangerousness might have been no
different from those whose additional hospitalization was under
section 3864 rather than being voluntary.
 While we conclude, therefore, that a five-day emergency
detention is a "commitment", and that it implicates the potential
for harm Congress sought to regulate under the firearms ban, we
realize the possibility of instances in which an initial commitment
of this type may later be shown, in further state proceedings, to
have been mistaken. This, however, is not such a case, hence we
need not decide to what extent subsequent proceedings before state
tribunals may vitiate a five-day emergency detention for purposes
of section 922(g)(4). Here, Chamberlain voluntarily elected to
remain at Acadia for more than a week after the initial five-day
admission period expired. He does not contest the validity of his
emergency admission, but only whether that admission constitutes a
legally sufficient "commitment." 
 We also note that Chamberlain and others similarly
situated are provided by Congress with the administrative means to
contest and, in appropriate circumstances, to remove the firearms
ban Congress has imposed against those committed to a mental
institution. Department of Treasury v. Galioto, 477 U.S. 556, 559
(1986). See also Waters, 23 F.3d at 35. Under 18 U.S.C. 925(c),
such persons may apply to the Secretary of the Treasury for relief
from the firearms ban. The Secretary may grant relief
 if it is established to his
 satisfaction that the circumstances
 regarding the disability, and the
 applicant's record and reputation, are
 such that the applicant will not be
 likely to act in a manner dangerous to
 public safety and that the granting of
 the relief would not be contrary to the
 public interest. 

18 U.S.C. 925(c). See 27 C.F.R. 178.144 (describing procedures
by which one may petition for relief). These procedures allow a
formerly committed person to challenge the continuing validity of
a determination that he suffers from a mental illness and is a
danger to himself or others. Although he could have done so,
Chamberlain did not avail himself of this administrative remedy. 
 We conclude that, under the circumstances presented here, 
Chamberlain was "committed" to a mental institution for purposes of
conviction under 18 U.S.C. 922(g)(4). 
 Affirmed.

 APPENDIX
34-B M.R.S.A. 3863
 3863 Emergency procedure 
 A person may be admitted to a mental hospital on an
emergency basis according to the following procedures.

 1. Application. Any health officer, law enforcement
officer or other person may make a written application to admit a
person to a mental hospital . . . stating:

 A. His belief that the person is mentally ill and,
because of his illness, poses a likelihood of serious harm; and

 B. The grounds for this belief.

 2. Certifying Examination. The written application shall
be accompanied by a dated certificate, signed by a licensed
physician or a licensed clinical psychologist, stating:
 
 A. The licensed physician or licensed clinical
psychologist has examined the person on the date of the
certificate; and
 
 B. He is of the opinion that the person is mentally ill
and, because of his illness, poses a likelihood of serious harm.

 * * * * * *

 3. Judicial Review. The application and accompanying
certificate must be reviewed by a Justice of the Superior Court,
Judge of the District Court, Judge of Probate or a justice of the
peace.
 
 A. If the judge or justice finds the application and
accompanying certificate to be regular and in accordance with the
law, the judge or justice shall endorse them. 

 B. A person may not be held against the person's will
in the hospital under this section, whether informally admitted 
under section 3831 or sought to be involuntarily admitted under
this section, unless the application and certificate have been
endorsed by a judge or justice, except that a person for whom an
examiner has executed the certificate under subsection 2 may be
detained in a hospital for a reasonable period of time, not to
exceed 18 hours, pending endorsement by a judge or justice, if:
 
 (1) For a person informally admitted under section
3831, the chief administrative officer of the hospital undertakes
to secure the endorsement immediately upon execution of the
certificate by the examiner; and
 
 (2) For a person sought to be involuntarily
admitted under this section, the person or persons transporting 
the person sought to be involuntarily admitted to the hospital
undertake to secure the endorsement immediately upon execution of
the certificate by the examiner.

 C. Notwithstanding paragraph B, subparagraphs (1) and
(2), a person sought to be admitted informally under section 3831
or involuntarily under this section may be transported to a
hospital and held for evaluation and treatment at a hospital
pending judicial endorsement of the application and certificate if
the endorsement is obtained between the soonest available hours of
7:00 a.m. and 11:00 p.m.

 * * * * * * 

 5. Continuation of hospitalization. If the chief
administrative officer of the hospital recommends further
hospitalization of the person, the chief administrative officer
shall determine the suitability of admission, care and treatment of
the patient as an informally admitted patient, as described in
section 3831. 

 A. If the chief administrative officer of the hospital
determines that admission of the person as an informally admitted
patient is suitable, the chief administrative officer shall admit
the person on this basis, if the person so desires.

 B. If the chief administrative officer of the hospital
determines that admission of the person as an informally admitted
patient is not suitable, or if the person declines admission as an
informally admitted patient, the chief administrative officer of
the hospital may seek involuntary commitment of the patient by
filing an application for the issuance of an order for
hospitalization under section 3864, except that if the hospital is
a designated nonstate mental health institution and if the patient
was admitted under the contract between the hospital and the
department for receipt by the hospital of involuntary patients,
then the chief administrative officer may seek involuntary
commitment only by requesting the commissioner to file an
application for the issuance of an order for hospitalization under
section 3864.

 (1) The application must be made to the District
Court having territorial jurisdiction over the hospital to which
the person was admitted on an emergency basis.

 (2) The application must be filed within 5 days
from the admission of the patient under this section, excluding the
day of admission and any Saturday, Sunday or legal holiday.

 C. If neither readmission nor application to the
District Court is effected under this subsection, the chief
administrative officer of the hospital to which the person was
admitted on an emergency basis shall discharge the person
immediately.

 6. Notice. Upon admission of a person under this
section, and after consultation with the person, the chief
administrative officer of the hospital shall notify, as soon as
possible regarding the fact of admission, the person's:

 A. Guardian, if known;

 B. Spouse;

 C. Parent;

 D. Adult child; or

 E. One of next of kin or a friend, if none of the other
persons exist.

If the chief administrative officer has reason to believe that
notice to any individual in paragraphs A to E would pose risk of
harm to the person admitted, then notice may not be given to that
individual.

 7. Post-admission examination. Every patient admitted to
a hospital shall be examined as soon as practicable after his
admission.

 A. The chief administrative officer of the hospital
shall arrange for examination by a staff physician or licensed
clinical psychologist of every patient hospitalized under this
section.

 B. The examiner may not be the certifying examiner
under this section or under section 3864.

 C. If the post-admission examination is not held within
24 hours after the time of admission, or if a staff physician or
licensed clinical psychologist fails or refuses after the
examination to certify that, in his opinion, the person is mentally
ill and due to his mental illness poses a likelihood of serious
harm, the person shall be immediately discharged.

 * * * * * *

34-B M.R.S.A. 3864 

 3864 Judicial procedure and commitment

 1. Application. An application to the District Court to
admit a person to a mental hospital, filed under section 3863,
subsection 5, paragraph B, shall be accompanied by:
 
 A. The emergency application under section 3863,
subsection 1;

 B. The accompanying certificate of the physician or
psychologist under section 3863, subsection 2; 

 C. The certificate of the physician or psychologist
under section 3863, subsection 7 that:

 (1) The physician or psychologist has examined the
patient; and
 
 (2) It is the opinion of the physician or
psychologist that the patient is a mentally ill person and, because
of that patient's illness, poses a likelihood of serious harm;

 D. A written statement, signed by the chief
administrative officer of the hospital, certifying that a copy of
the application and the accompanying documents have been given
personally to the patient and that the patient and the patient's
guardian or next of kin have been notified of the patient's right
to retain an attorney or to have an attorney appointed, of the
patient's right to select or to have the patient's attorney select
an independent examiner and regarding instructions on how to
contact the District Court; and

 E. A copy of the notice and instructions given to the
patient.

 2. Detention pending judicial determination. 
Notwithstanding any other provisions of this subchapter, a person,
with respect to whom an application for the issuance of an order of
hospitalization has been filed,, may not be released or discharged
during the pendency of proceedings, unless:

 A. The District Court orders release or discharge upon
the request of the patient, or the patient's guardian, parent,
spouse or next of kin;

 B. The District Court orders release or discharge upon
the report of the applicant that the person may be discharged with
safety;

 C. A court orders release or discharge upon a writ of
habeas corpus under section 3804; or

 D. Upon request of the commissioner, the District Court
orders the transfer of a patient in need of more specialized
treatment to another hospital. In the event of a transfer, the
court shall transfer its file to the District Court having
territorial jurisdiction over the receiving hospital.

 3. Notice of receipt of application. The giving of
notice of receipt of application and date of hearing under this
section is governed as follows.

 A. Upon receipt by the District Court of the
application and accompanying documents specified in subsection 1,
the court shall cause written notice of the application and date of
hearing:

 (1) To be mailed within 2 days of filing to the
person; and

 (2) To be mailed to the person's guardian, if
known, and to the person's spouse, parent or one of the person's
adult children, if none of these persons exist or if none of those
persons can be located, to one of the person's next of kin or a
friend, except that if the chief administrative officer has reason
to believe that notice to any of these individuals would pose risk
of harm to the person who is the subject of the application, notice
to that individual may not be given.

 B. A docket entry is sufficient evidence that notice
under this subsection has been given.

 4. Examination. Examinations under this section are
governed as follows.

 A. Upon receipt by the District Court of the
application and the accompanying documents specified in subsection
1 and at least 3 days after the person who is the subject of the
examination was notified by the hospital of the proceedings and of
that person's right to retain counsel or to select an examiner, the
court shall cause the person to be examined by 2 examiners.

 (1) Each examiner must be either a licensed
physician or a licensed clinical psychologist.

 (2) One of the examiners must be a physician or
psychologist chosen by the person or by that person's counsel, if
the chosen physician or psychologist is reasonably available.

 (3) Neither examiner appointed by the court may 
be the certifying examiner under section 3863, subsection 2 or 7.

 B. The examination shall be held at the hospital or at
any other suitable place not likely to have a harmful effect on the
mental health of the person.

 C. If the report of the examiners is to the effect that
the person is not mentally ill or does not pose a likelihood of
serious harm, the application shall be ordered discharged
forthwith.
 
 D. If the report of the examiners is to the effect that
the person is mentally ill or poses a likelihood of serious harm,
the hearing shall be held on the date, or on the continued date,
which the court has set for the hearing.

 5. Hearing. Hearings under this section are governed as
follows.

 A. The District Court shall hold a hearing on the
application not later than 15 days from the date of the
application.

 (1) On a motion by any party, the hearing may be
continued for cause for a period not to exceed 10 additional days.

 (2) If the hearing is not held within the time
specified, or within the specified continuance period, the court
shall dismiss the application and order the person discharged
forthwith.

 (3) In computing the time periods set forth in
this paragraph, the District Court Civil Rules shall apply.

 B. The hearing must be conducted in as informal a
manner as may be consistent with orderly procedure and in a
physical setting not likely to have harmful effect on the mental
health of the person. 

 * * * * * *

 C. The court shall receive all relevant and material
evidence which may be offered in accordance with accepted rules of
evidence and accepted judicial dispositions.

 (1) The person, the applicant and all other
persons to whom notice is required to be sent shall be afforded an
opportunity to appear at the hearing to testify and to present and
cross-examine witnesses.

 (2) The court may, in its discretion, receive the
testimony of any other person and may subpoena any witness.

 D. The person shall be afforded an opportunity to be
represented by counsel, and, if neither the person nor others
provide counsel, the court shall appoint counsel for the person.

 E. In addition to proving that the patient is a
mentally ill individual, the applicant shall show:

 (1) By evidence of the patient's actions and
behavior, that the patient poses a likelihood of serious harm; and

 (2) That, after full consideration of less
restrictive treatment settings and modalities, inpatient
hospitalization is the best available means for the treatment of
the person.

 F. In each case, the applicant shall submit to the
court, at the time of the hearing, testimony, including expert
psychiatric testimony, indicating the individual treatment plan to
be followed by the hospital staff, if the person is committed under
this section, and shall bear any expense for witnesses for this
purpose.

 * * * * * *

 6. Court findings. Procedures dealing with the District
Court's findings under this section are as follows.

 A. The District Court shall so state in the record, if
it finds upon completion of the hearing and consideration of the
record:

 (1) Clear and convincing evidence that the person
is mentally ill and that the person's recent actions and behavior
demonstrate that the person's illness poses a likelihood of serious
harm;

 (2) That inpatient hospitalization is the best
available means for treatment of the patient; and

 (3) That it is satisfied with the individual
treatment plan offered by the hospital to which the applicant seeks
the patient's involuntary commitment.

 * * * * * *

 7. Commitment. Upon making the findings described in
subsection 6, the court may order a commitment to a hospital for a
period not to exceed 4 months in the first instance and not to
exceed one year after the first and all subsequent hearings. 

 A. The court may issue an order of commitment
immediately after the completion of the hearing, or it may take the
matter under advisement and issue an order within 24 hours of the
hearing.

 B. If the court does not issue an order of commitment
within 24 hours of the completion of the hearing, it shall dismiss
the application and order the patient discharged immediately.

 8. Continued involuntary hospitalization. If the chief
administrative officer of the hospital to which a person has been
committed involuntarily by the District Court recommends that
continued involuntary hospitalization is necessary for that person,
the chief administrative officer shall notify the commissioner. 
The commissioner may then, not later than 30 days prior to the
expiration of a period of commitment ordered by the court, make
application in accordance with this section to the District Court
that has territorial jurisdiction over the hospital designated for 
treatment in the application by the commissioner for a hearing to
be held under this section.

 * * * * * * 

 11. Appeals. A person ordered by the District Court to
be committed to a hospital may appeal from that order to the
Superior Court.

 A. The appeal is on questions of law only.

 B. Any findings of fact of the District Court may not
be set aside unless clearly erroneous.

 C. The order of the District Court shall remain in
effect pending the appeal.

 D. The District Court Civil Rules and the Maine Rules
of Civil Procedure apply to the conduct of the appeals, except as
otherwise specified in this subsection.