# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
May 9, 2022

Lyle W. Cayce
Clerk

No. 21-30194

United States of America,

*Plaintiff—Appellee*,

*versus*

Robert Earl Tucker, Jr.,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:20-CR-43-1

---

Before Willett, Engelhardt, and Wilson, *Circuit Judges*.

Don R. Willett, *Circuit Judge*:

Robert Earl Tucker, Jr., was found guilty of three counts of making false statements to a federally licensed firearms dealer in violation of 18 U.S.C. § 922(a)(6) and two counts of possession in violation of 18 U.S.C. § 922(g)(4). Tucker's pro se appeal raises a host of issues, but we need only address one: whether the district court plainly erred by allowing constructive amendment of his indictment. It did, and we REVERSE.

No. 21-30194

I

First the facts. Over a decade ago, Tucker was involuntarily transported to the emergency room under an order for protective custody issued by local law enforcement. A doctor at the hospital concluded that Tucker presented a danger to himself and others. So the doctor issued a physician emergency certificate that authorized Tucker's involuntarily hospitalization for up to fifteen days.

Tucker again found himself in hot water two weeks after release. At the request of Tucker's mother,[1] the Morehouse Parish coroner issued a new order for protective custody so that yet another doctor could "determine if [Tucker] should be voluntarily admitted, admitted by emergency certificate, admitted as a non-contested admission, or discharged." Another emergency room doctor determined that Tucker was "in need of immediate psychiatric treatment" because he posed a danger to himself and others. That doctor issued a new physician emergency certificate, and Tucker was again hospitalized. During this thirteen-day period of treatment, Tucker was diagnosed with paranoid schizophrenia and prescribed medications.

Fast forward to 2019. Tucker bought a pistol from a firearms dealer in Baton Rouge. How? Well, Tucker stated on the ATF form that he had neither "been adjudicated as a mental defective" nor "committed to a mental institution." Tucker received his firearm several days later.

Not too long afterward, law enforcement detained Tucker—unrelated to his previous purchase—after someone identified him as a suspect in an

---

[1] Tucker's mother, with whom he lived, reported that he (1) was recently released from involuntary hospitalization, (2) had "become angry," (3) would "rant[] about stuff," (4) "wrecked his vehicle but refuses to tell what happened or can't remember," and (5) "refuses meds or help."

active-shooter investigation at Walmart. Police discovered that Tucker possessed a loaded firearm and an extra magazine.

ATF joined the ensuing interrogation. At one point, Tucker reported that he had been hospitalized and held for a 72-hour observation after his mother called the police because of an argument about marijuana use. Tucker later admitted, during another interview, that he lied about the length of his prior hospitalization out of concern that he might lose his right to carry a firearm. It is unclear what, if anything, came of these interviews.

A year later, Tucker tried to purchase another firearm and again noted that he had never been adjudicated as a "mental defective" or committed to a mental institution. An ATF agent then served Tucker at his home with a warning that he was prohibited from possessing firearms or ammunition. The agent explained that this was because Tucker had been "admitted into a mental institution for a lengthy period of time." Later that day, Tucker called the agent to ask (1) whether he could rent guns to shoot at a range, and (2) whether he could purchase a firearm if he stated that he had been adjudicated as a mental defective. The agent answered "no" to both questions.

Three days later, Tucker reached out to the ATF agent to share that he was "buying a weapon this week" and that he "hope[d] to see [the agent] soon." The agent again told Tucker that he was prohibited from purchasing or possessing a firearm. Tucker disagreed. "I am not prohibited from purchasing or possessing a firearm," he texted the officer. Undeterred, Tucker then went to purchase a handgun and again represented on the ATF form that he had never been adjudicated as a mental defective or committed.

Law enforcement obtained a warrant for Tucker's home and seized a variety of ammunition. Tucker was arrested and later indicted for three counts of false statements to a federally licensed firearms dealer (for thrice representing "that he had not been adjudicated as a mental defective") in

violation of § 922(a)(6) and two counts of possession (one for the firearm seized from him at Walmart and another for the ammunition seized at his home) in violation of § 922(g)(4).

## II

Tucker represents himself on appeal (as he did for most of trial) and raises a panoply of issues. We need only tackle one: that the district court reversibly erred because the jury instructions constructively amended Tucker's indictment. The United States counters by claiming Tucker cannot establish plain error that merits remedy.

We agree with Tucker.

## A

The standard of review is well settled. If there was no objection in the trial court, we review constructive amendment claims for plain error.[2] "A jury charge is plain error if: (1) it was erroneous; (2) the error was plain; and (3) the plain error affected the substantial rights of the defendant."[3] Only once "those conditions are met" do "we have the discretion to correct the error," if that error "seriously affect[s] the fairness, integrity[,] or public reputation of the judicial proceedings."[4]

## B

Abundant precedent confirms "[t]he Fifth Amendment['s] guarantee[] that a criminal defendant will be tried only on charges alleged in

---

[2] *See, e.g.*, *United States v. Dixon*, 273 F.3d 636, 639–40 (5th Cir. 2001).

[3] *United States v. Daniels*, 252 F.3d 411, 414 (5th Cir. 2001).

[4] *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)).

the grand jury indictment."[5] This means that "only the grand jury may amend an indictment once it has been issued."[6]

Here, however, the district court erroneously instructed on a theory of guilt that was obviously outside the indictment. Tucker was charged under a statute that prohibits a person from possessing a firearm or ammunition if he or she "has been adjudicated as a mental defective or . . . has been committed."[7] Yet *Tucker's indictment alleged only that he had been adjudicated as a "mental defective"*; it did not mention commitment. This would have posed no problem had the district court's jury charge not instructed that guilt could rest on *either* adjudication or commitment. This erroneously granted the jury license to paint Tucker's guilt with too broad a brush.[8]

We therefore conclude that the jury instructions were plainly flawed.

## C

We next examine whether the plainly erroneous instruction impacted Tucker's substantial rights. This requires us to decide whether there is "a

---

[5] *Dixon*, 273 F.3d at 639 (quoting *United States v. Arlen*, 947 F.2d 139, 144 (5th Cir. 1991)); *see also, e.g.*, *United States v. Chandler*, 858 F.2d 254, 256 (5th Cir. 1988) ("Incident to this constitutional guarantee is the longstanding principle of our criminal justice system that the charges contained in an indictment may not be broadened or altered through amendment, except by the grand jury itself.").

[6] *Daniels*, 252 F.3d at 413; *see also, e.g.*, *Dixon*, 273 F.3d at 639. As a result, "[a]n indictment is constructively amended . . . if the jury is permitted to convict the defendant on 'an alternative basis permitted by the statute but not charged in the indictment.'" *Dixon*, 273 F.3d at 639 (citation omitted); *see also United States v. Munoz*, 150 F.3d 401, 417 (5th Cir. 1998) ("[O]ur concern is whether the indictment has notified the defendant adequately to permit him to prepare his defense and has not left him vulnerable to later prosecution because of a failure to define the offense with particularity.").

[7] 18 U.S.C. § 922(g)(4).

[8] *See, e.g.*, *Daniels*, 252 F.3d at 414.

reasonable likelihood" the jury applied the flawed instruction in an unconstitutional manner.[9] We believe so.

Not only did the district court's preliminary instructions suggest that the United States needed to prove *either* that Tucker was "adjudicated as a mental defective or . . . committed to a mental institution," but (1) trial counsel's opening statement referred to Tucker's "involuntary commitment," (2) the jury received evidence that Tucker was involuntarily hospitalized due to his mental health, and (3) the jury was also informed that ATF's legal team believed Tucker could not possess firearms or ammunition because he "stayed in a mental hospital for a lengthy period of time." Even worse, the district court later prohibited Tucker from "quibbl[ing] over adjudicated or committed" because, as the judge explained before the jury, the two "are the same thing under the statute."[10] And though it is theoretically possible that the jury ignored this exchange and remained focused on whether Tucker was adjudicated a "mental defective"—the record suggests otherwise: after the district court erroneously instructed the jurors, they asked for (and were refused) "clarification" as to whether "adjudicated as a mental defective is the same as being committed to a mental institution." This speaks volumes.

---

[9] *United States v. Phipps*, 319 F.3d 177, 190 (5th Cir. 2003) (quoting *Victor v. Nebraska*, 511 U.S. 1, 6 (1994)).

[10] The district court's misconception is peppered throughout the record. During one sidebar, for example, Tucker explained that his line of questioning focused on the fact that "[the Government] did not meet any statutory requirements for a committal" and that the grand jury focused only on the "statutory requirements for adjudicated." The district court responded, "it's the same thing." During another sidebar, too, the court explained to Tucker that "adjudicated includes commitment to a mental institution or a psychiatric ward." Tucker tried to explain his position, noting that his "indictments don't say committal," but the district court made clear "it doesn't have to."

No. 21-30194

Even so, the United States maintains that Tucker's substantial rights were unsullied. The reason? We are told the jury received overwhelming evidence that Tucker was adjudicated as a "mental defective," thus removing any doubt as to whether "the jury would have convicted [Tucker]" without the erroneous instruction. But we are not so sure.

First some housekeeping. We think it necessary to make clear that this *legal issue* should not have been submitted to the jury. A chorus of circuits have concluded that adjudication as a "mental defective" is a question of law, not fact.[11] Even the United States implicitly recognizes as much in its briefing, which admits *de novo* review. Yet the district court submitted this legal question to the finders of fact. This was obviously incorrect.

Second, we do not believe Tucker underwent an "adjudication" in the sense contemplated by § 922(g)(4). Black's Law Dictionary explains that "adjudicate" commonly means "[t]o rule on *judicially*."[12] Courts across the country have similarly embraced this common understanding.[13] Yet the

---

[11] *See, e.g.*, *United States v. McLinn*, 896 F.3d 1152, 1156 (10th Cir. 2018) (accumulating cases from the First, Second, Fourth, Sixth, Eighth, and Eleventh Circuits).

[12] *Adjudicate*, BLACK'S LAW DICTIONARY 52 (11th ed. 2019) (emphasis added); *accord* WEBSTER'S NEW COLLEGIATE DICTIONARY 56 (9th ed. 1987) (defining "adjudicate" as "to settle judicially"); *see also, e.g.*, WEBSTER'S NEW INTERNATIONAL DICTIONARY 33 (2d ed. 1939) (defining "adjudicate" as "[t]o hear or try and determine, as a court" or "to settle by judicial decree"); Benjamin W. Pope, *Legal Definitions* (1919–1920) (defining "adjudication" as "[a]n application of the law to the facts and an authoritative declaration of result").

[13] *See, e.g.*, *United States v. Rehlander*, 666 F.3d 45, 50 (1st Cir. 2012) ("Congress did not prohibit gun possession by those who were or are mentally ill and dangerous[] . . . . Congress sought to piggyback on determinations made in prior judicial proceedings . . . ."); *United States v. Vertz*, 40 F. App'x 69, 75 (6th Cir. 2002) ("Congress specifically required an 'adjudication' when a mental defect is the disabling circumstance . . . but it did not specify any requirement of judicial involvement when commitment to a mental health institution is the disabling circumstance."); *Wilborn v. Barr*, 401 F. Supp. 3d 501, 510 (E.D. Pa. 2019) ("[A] plain reading of the term 'adjudication' provides the 'involvement of a

record lacks anything that resembles, let alone aspires to, judicial process.[14] This is no trivial detail.

Third, even were we to assume Tucker underwent an "adjudication," the record contains no evidence that Tucker was adjudged a "mental defective." The term has long carried a particular meaning, which speaks not to generalized mental illnesses but instead to an archaic class of intellectual disability.[15] Yet the United States would have us broaden the concept to

---

judicial-decision maker, the resolution of a dispute after consideration of argument by the parties involved, and a deliberative proceeding with some form of due process.'" (citation omitted)).

[14] The United States insists that the physician emergency certificate process constituted an adjudication, leaning heavily on the regulatory indication that "adjudicated" includes a "determination by . . . [a] lawful authority." *See generally* 27 C.F.R. § 478.11. But if we were to venture past the statute's plain language, a potpourri of interpretive canons—like the constitutional-doubt canon or the rule of lenity, to name two—would betray the United States' desired reading. Even courts interpreting the ATF's regulatory definition have concluded similarly. *See, e.g.*, *Franklin v. Sessions*, 291 F. Supp. 3d 705, 716 (W.D. Pa. 2017) (applying the principle of *noscitur a sociis*, concluding "other lawful authority" must resemble the specific, introductory categories of a "court, board, [or] commission"). Thankfully, the plain text of the statute relieves us of the need to precariously balance the Second Amendment on *ex parte*, often-unreviewable opinions of medical professionals. We leave the constitutionality of that framework for another day.

[15] *See, e.g.*, *United States v. Hansel*, 474 F.2d 1120, 1124–25 (8th Cir. 1973) (accumulating various sources that pre-date the passage of the Gun Control Act in 1968); *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 687 (6th Cir. 2016) (en banc) ("[W]e note that § 922(g)(4) does not use the phrase 'mentally ill,' nor does it attempt to prohibit all currently mentally ill persons from firearm possession. Rather, the statute uses prior judicial adjudications—incompetency and involuntary commitment—as proxies for mental illness."); *see also, e.g.*, *United States v. B.H.*, 466 F. Supp. 2d 1139, 1147 (N.D. Iowa 2006) (holding that the appellant was not "adjudged as a mental defective" because he was never found to lack a normal degree of intellectual capacity, as is the common understanding in both psychology and the law); *cf. also, e.g.*, *Townsend v. Sain*, 372 U.S. 293, 303 (1963) ("An expert witness called by the prosecution testified that Townsend had such a low intelligence that he was a near mental defective . . . ."); *Culombe v. Connecticut*, 367 U.S. 568, 620 (1961) ("The man . . . was a thirty-three-year-old mental defective . . . with an intelligence quotient of sixty-four and a mental age of nine to nine and a half years.");

No. 21-30194

encompass *any* diagnosis involving a danger to oneself or others. We decline. Neither will we speculate regarding whether Congress intended to (or could) constitutionally cull anyone with a mere history of such diagnoses.[16] Our task looks to text, not tea leaves. We thus join the host of courts that have interpreted the phrase "mental defective" narrowly, consistent with its common understanding preceding the enactment of § 922(g)(4).[17]

Finally, we pause to note that the United States' reliance on *Dixon* is misplaced. *Dixon* rejected the appellant's constructive amendment claim because the contested jury charge was encompassed by the indictment.[18] As detailed above, this case rests on far different factual footing.

---

*United States ex rel. Johnson v. Shaughnessy*, 336 U.S. 806, 808 (1949) (discussing Section 3 of the Immigration Act of 1917, which excluded from admission to the United States those found "mentally defective"). *See generally* Helene Burgess, *The Mental Defective and the Law*, 23 Intramural L. Rev. N.Y.U. 115, 116 (1967) (noting "mental defective" refers to "those testing in the underaverage group who[] . . . could never perform at the level of average intelligence" or "who are so severely and recognizably behind the norm as to warrant special . . . help"); Philip L. Harriman, *Handbook of Psychological Terms* 98 (1963) (defining "mental defective" as "an idiot, imbecile, or moron; one who cannot adjust to the community by reason of low intelligence"); John D. Comrie, Black's Medical Dictionary 590 (H. A. Clegg ed., 18th ed. 1944) (defining "mental defectiveness" as "a primary condition in which certain persons never develop to the average standard of intelligence"); *cf. generally* American Pocket Medical Dictionary 585 (W. A. Newman Dorland ed., 17th rev. ed. 1943) (defining "moron" as "[a] *mental defective* whose mental age is between eight and twelve years" (emphasis added)).

[16] *See, e.g.*, *Hansel*, 474 F.2d at 1125 ("If it is the desire of Congress to prohibit persons who have any history of mental illness from possessing guns, it can pass legislation to that effect, but we cannot read into this criminal statute an intent to do so.").

[17] *See supra* note 15.

[18] *Dixon*, 273 F.3d at 639–40.

No. 21-30194

## D

The last facet of our inquiry asks whether the identified error merits relief. As always, our answer turns on whether the error "seriously affect[s] the fairness, integrity[,] or public reputation of judicial proceedings."[19]

Almost a century and half have passed since the Supreme Court first announced that "charges may not be broadened through amendment except by the grand jury itself."[20] But this constitutional guarantee rings hollow where, as here, a district court simultaneously enlarges the grounds on which the jury could find a defendant guilty while truncating the defendant's ability to navigate the new, unindicted battlefield. Even worse, this venture creates the added risk that a defendant's conviction rested on divergent theories of liability—undermining the centuries-long demand for juror unanimity.[21]

The district court's error struck a blow to the fairness, integrity, and public reputation of Tucker's proceedings.[22] This requires correction.

---

[19] *Daniels*, 252 F.3d at 414 (citation omitted); *see also Olano*, 507 U.S. at 736–37 (noting that this standard operates "independent of . . . innocence").

[20] *Stirone v. United States*, 361 U.S. 212, 215–16 (1960) (citing *Ex parte Bain*, 121 U.S. 1 (1887), *overruled by United States v. Cotton*, 535 U.S. 625, 631 (2002) (rejecting the jurisdictional effect of a defective indictment)).

[21] *See, e.g.*, *United States v. Holley*, 942 F.2d 916, 926 (5th Cir. 1991) (guarding the "constitutional right to a unanimous verdict where there exists a genuine risk that the jury is confused or that a conviction may occur as the result of different jurors" focusing on different theories of liability); *see also, e.g.*, *United States v. Lasley*, 917 F.3d 661, 664–65 (8th Cir. 2019) (same). *See generally Ramos v. Louisiana*, 140 S. Ct. 1390, 1422 (2020) (Thomas, J., concurring) (noting by the time "the states ratified the Sixth Amendment . . . unanimous verdicts had been required for about 400 years").

[22] *See, e.g.*, *United States v. Griffin*, 324 F.3d 330, 356 (5th Cir. 2003) (holding that constructive amendment was plain error and reversing).

No. 21-30194

## III

We close by noting that our holding affects not only Tucker's convictions for possession but also those for false statements. Furthermore, we believe a remand would prove ineffective where, as here, the evidence cannot support the indictment.[23]

REVERSED.

---

[23] This conclusion is further reinforced by the fact that the United States concedes Tucker was not committed for the purposes of § 922(g)(4) because, under Louisiana law, a commitment requires court action. *See, e.g.*, *United States v. Giardina*, 861 F.2d 1334, 1334–37 (5th Cir. 1988); *see also Chandler*, 858 F.2d at 258 (Jolly, J., dissenting in part) (observing that where "the evidence is insufficient to support the charge made in the indictment[] . . . [w]e should simply say so and let [the] defendant be done with it").